REID, Judge.
This malpractice action was brought by Lawrence A. Uter, individually and as natural tutor of his minor daughter, Candace C. Uter, against The Bone and Joint Clinic, a partnership composed of Dr. Thomas P. Campanella, Dr. Moss M. Ban-nerman and Dr. Richard B. Means, and against the individual partners named, Our Lady of the Lake Hospital, Incorporated, National Surety Corporation, the professional liability insurer of the partnership and its members, and Hartford Accident and Indemnity Company, liability insurer of Our Lady of the Lake Hospital. The petition alleges that on June 14, 1961, plaintiff’s daughter entered Our Lady of the Lake Hospital, Incorporated for a surgical procedure to correct a deformity of her right knee which had developed following a fracture of her leg in 1955. Plaintiff alleges that the following day the surgery was performed; that following the operation his daughter developed an infection and necrosis in the area of the operative site, which required additional treatment, and due to this and other treatment then being administered, she was not discharged from the hospital until July 1, 1961. He further alleges that following his daughter’s discharge from the hospital the infection and necrosis of the operative site became worse, which infection was later determined to be a “staph” infection. On July 30, 1961 his daughter was readmitted to Our Lady of the Lake Hospital in order to cleanse the wound and to cover the scarred area with a skin graft. Plaintiff then alleges that a skin graft was attempted on August 3, 1961; on August 10, 1961 his daughter was discharged from the hospital; the infection did not clear up and she was readmitted to the hospital on August 26, 1961; a further skin graft was performed on August 27, 1961; and the patient was again discharged from the hospital on August 29, 1961. He alleges that at the time she returned to school she was confined to a wheel chair and when she finally was in a position to attempt to use her right extremity she found that she was more disabled than she had been prior to the operation, having lost the use of her right foot. He seeks damages on behalf of his daughter in the amount of $450,000 and on behalf of himself in the amount of $25,000. Defendants denied negligence and liability. For written reasons assigned March 4, 1965, judgment was rendered and signed March 5, 1965, rejecting the demands of the plaintiff and fixing the expert witness fees of the doctors and taxing the same as costs.
Plaintiff contends his case speaks for itself; that his daughter’s injuries and disabilities and suffering were caused solely by the joint negligence of the defendants and her condition is one which would not exist except for such negligence, and thus that the doctrine of “Res Ipsa Loquitur” is applicable. In the alternative he pleads specific acts of negligence, including: improperly cleansed and sterilized instruments and facilities in the hospital; improperly made incision at the operative site, which caused a severance of the peroneal nerve; *306 improperly performed operation; improperly applied cast; failure to cut and open cast in order to relieve pressure and swelling; delay in administering medication to prevent swelling and infection; and operating at a time when it was or should have been known that the patient would be susceptible to infection and without effort to build up her resistance prior to operation.
After defendant doctors ceased treating Miss Uter she was under the care of Dr. Jack Wickstrom of New Orleans.
Plaintiff bases his case mostly on alleged negligent post operative care. Very little negligence on the part of Our Lady of the Lake Hospital is alleged. It is our belief that the record fails to prove any negligence on the part of the hospital and we therefore agree with the Trial Judge’s decision to dismiss plaintiff’s suit as against the hospital.
It is important to first point out that the leading Louisiana case on medical malpractice is Meyer v. St. Paul-Mercury Indemnity Company, 225 La. 618, 73 So.2d 781, which was decided by the Supreme Court of Louisiana in 1953 and has continued to be the law on that subject since that time. That case held in essence that a physician, surgeon or dentist has the duty to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community and to use reasonable care and diligence, along with his best judgment in the application of his skill and “is not required to exercise the highest degree of skill and care possible.”
This Court agrees with the Trial Judge that in the light of the holding of the Supreme Court in the Meyers case, supra, which has been repeatedly upheld by this and other Courts, it is not necessary to discuss other Louisiana decisions or decisions from other jurisdictions on the question here under consideration. The final decision must depend upon the testimony of medical experts as to the competency and skill of the defendant doctors and the reasonableness and sufficiency of the care, diligence and best judgment exercised by the defendant doctors.
Dr. Jack Wickstrom was the first principal witness called by counsel for plaintiff. He is a widely recognized expert in the field of orthopedic surgery, is presently Chairman of the Division of Orthopedic Surgery at Tulane University, and has taught his specialty at that University in addition to practicing in the New Orleans area. Dr. Wickstrom was examined at great lengths. Counsel for plaintiff propounded innumerable questions in an effort to establish negligence on the part of the defendant doctors especially and also on the part of the hospital. Dr. Wickstrom had the benefit of the entire case history as told him by Miss Uter and her father and mother and had treated Miss Uter from time to time for several years. He had examined the hospital record relative to the period in question here. His testimony shows, in pertinent part, the following:
“Q. Dr. Wickstrom, during the noon recess have you had an opportunity to review the nurses’ chart, the temperature chart?
A. I have.
Q. Do you have an opinion, sir, as to whether there was any evidence of omission or commission on the part of Dr. Bannerman, Dr. Campanella or Dr. Means insofar as the post operative care of Miss Candace Uter was concerned subsequent to surgery on June 15, 1961?
A. From this record it would appear that they were in attendance once or twice daily. There’s no evidence of excessive pain, more than one would expect in this youngster. She was controlled *307 by- — she required codeine or Demoral every, sometimes four, four and a half hours, usually three and a half hours, which is not unusual. And I see no evidence of neglect on their part, either of the nurses or of the doctors from this record.
Q. Yes, sir. Doctor, you are familiar with the standards of care that are exercised and in effect in the area of Baton Rouge and New Orleans by orthopedic specialists, such as you and Dr. Means and Dr. Bannerman and Dr. Campanella. Are you able to see any deviation from those standards that are customarily practiced in in the Baton Rouge-New Orleans area?
A. I see no evidence, recorded evidence, of any deviation from the standards in any respect.
Q. Based on your knowledge and history of the case as related to you by Miss Candace Uter and members of the Uter family do you see any deviation from the standards of care exercised by, practiced by orthopedic specialists in the Baton Rouge-New Orleans area?
A. I don’t believe they have recorded this, described it to me, their own — I say they have not recorded or described this to me, their opinion as to what happened.
Q. But based on what you know, what you have been told, would you have an opinion as to any deviation from those customs and standards ?
A. I would not- — I have not found any evidence of this. The only thing, Mrs. Uter described to me once some confusion that Candy had postoperatively, and I don’t know when this was, rather a confused state for a couple of days. I don’t see any particular reference to this in the record here. This was the mother’s interpretation of her, and as I say now, I’m not certain what day this was or when it was.”
He further testified that he considered all of the defendant doctors possess the required skill and competency to professionally handle the osteotomy procedure performed and the postoperative care of Miss Uter.
Dr. William E. Smith, also a well qualified and recognized orthopedic surgeon, a Diplómate of the American Board of Orthopedic Surgery, and during the period in question and for approximately six years prior thereto engaged in the practice of his specialty in the Baton Rouge area. Dr. Smith was called as a witness for the defendants and he had examined Miss Uter several months prior to the trial at their instance. Referring to his examination of Dr. Campanella’s surgeon’s report, Dr. Smith said:
“Q. As a practicing physician and specialist in the field of orthopedics does that procedure as outlined in that chart conform to the standards of other orthopedists practicing that specialty of medicine in the area of Baton Rouge ?
A. Yes.
Q. Do you have any criticism of that procedure as outlined by Dr. Campanella ?
A. No.
Q. Do you find any evidence or suggestion of omission or commission in the technique and skill *308 exercised by him in performing that procedure?
A. No.
Q. Did you also look at and examine the temperature chart?
A. Yes.
Q. Prior to the evening of Tuesday, June 20th, 1961, did that chart reflect anything that would have suggested to you the need of windowing or cutting the cast on the girl’s leg?
A. No.
Q. Is it customary and normal for a patient undergoing an os-teotomy procedure such as this one to run temperature postop-eratively in the area of 99 to 101, or 100, such as the temperature chart shows here?
A. For what period of time?
Q. I’ll ask you, doctor, three to five days, six days.
A. It is not unusual in a major orthopedic surgical procedure of this type for a patient to have a very unstable temperature curve varying from subnormal to normal up to 101 for a week or ten days following surgery.”
He also was asked if, based on his review of the hospital chart and the records and his knowledge of the case history, he found any suggestion or evidence of omission or commission on the part of Dr. Campanella in his professional care of Miss Uter and over the objection of counsel for plaintiff, overruled by the Court, he said he did not. He was asked the same question with respect to the postoperative care given Miss Uter by Dr. Moss Bannerman and Dr. Richard Means and he gave the same answer.
Dr. Richard M. Nunnally, an expert in the field of pathology, practicing predominately at Our Lady of the Lake Hospital, Dr. Albert L. McQuown, also an expert in the field of pathology, and Dr. Perry L. Chesney, an expert in the field of surgery, all testified on behalf of Our Lady of the Lake Hospital. Dr. Chesney testified exclusively as to the sterilization techniques used at the Hospital, which he felt were up to the standards of the community. Dr. Nunnally and Dr. McQuown testified relative to staphylococcus infection and the sterilization techniques used. None of the testimony of these doctors, or anyone else, showed any negligence on the part of the hospital and certainly showed no connection between any techniques used by the hospital and any staph infection the girl might have had.
While plaintiff admits the qualifications of the three defendant doctors, he contends they did not use reasonable care, diligence and their best judgment in Miss Uter’s case. However, in view of the fact that plaintiff’s own witness, Dr. Wickstrom, as well as Dr. Smith and Dr. McQuown, all testified they found no deviation from the approved and accepted procedures in such cases, we will not discuss all of plaintiff’s complaints of negligence, but we do feel that we should cover the most serious accusation by plaintiff against Dr. Campanella. The Trial Judge has very ably covered this point and we quote below from his reasons for judgment:
“In my opinion the most serious charge of negligence made by plaintiff is that Dr. Campanella abandoned her shortly after the surgery without having informed her or her parents of his plan to do so, leaving her case to Dr. Bannerman and Dr. Means who could not and did not give her the proper post operative care that Dr. Campanella could and would have given if he had remained with her. There is nothing to show that plaintiff was prejudiced by Dr. Campanella’s leaving Dr. Bannerman and Dr. Means in charge of her case. How *309 ever, that conclusion on the part of the court only slightly minimizes the seriousness of this charge against Dr. Campanella.
“Plaintiff and her parents testified they had no notice prior to the surgery that Dr. Campanella planned to leave on vacation immediately after the surgery; that since the surgery was elective they would not have scheduled it at that time if they had known of Dr. Campanella’s vacation plans. Plaintiff’s mother testified she did not learn of Dr. Campanella’s absence until late in the day on Saturday, June 17, 1961, more than 48 hours after the surgery, and that she informed her husband of the doctor’s absence shortly after she learned of it. Plaintiff testified that according to her recollection she did not know of Dr. Campanella’s absence until Tuesday, June 20, 1961, five days after the surgery.
“Dr. Campanella testified that he felt sure he had informed plaintiff and her parents of his vacation plans prior to the surgery, but that he could not testify positively as to the time and place or what was said in that connection. However, he testified that he discussed the matter with plaintiff’s mother and Dr. Means just outside the recovery room immediately after the surgery.
“Dr. Means testified that on the occasion of the visit of plaintiff and her mother to Dr. Campanella’s office a few days prior to the surgery, which is admitted to have been on June 8, 1961, he was called in to Dr. Campanella’s office to meet plaintiff and her mother; that this struck him as unusual since he had become acquainted with them on prior occasions; that at this time Dr. Campanella informed plaintiff and her mother of his vacation plans and suggested they might prefer to postpone the surgery until he returned from his vacation; that he also informed them he would leave the post operative care of plaintiff to Dr. Means and Dr. Bannerman in the event the surgery was performed prior to his vacation. To the same effect is the testimony of Mrs. Patricia LeBlanc, who was at that time Dr. Campanella’s office nurse, and who had been in that position for several years, but who retired therefrom two or three years ago. Mrs. LeBlanc also testified that during this visit of plaintiff and her mother to Dr. Campanella’s office she and plaintiff were left alone in Dr. Campanella’s office for a brief period and that they discussed Dr. Campanella’s vacation plans. Dr. Means also testified that Dr. Campanella discussed the matter with him and plaintiff’s mother outside the recovery room shortly after the surgery.
“Plaintiff’s counsel vigorously cross examined Dr. Means and Mrs. LeBlanc on this matter, seeking to cast doubt on their testimony as to events occurring more than three years ago. However, it must be remembered that Dr. Campanella’s alleged desertion of plaintiff without notice became an issue in the case within a relatively short time after the surgery when their memories had to go back at most only a few months, and more probably only a few weeks, and possibly only a few days.
“It is inconceivable to me that plaintiff’s parents would have taken no notice of Dr. Campanella’s absence for more than forty-eight hours after the surgery if they had not been informed of his vacation plans prior to the surgery. It is equally significant that plaintiff took no notice of the doctor’s absence until five days after the surgery.
“In my opinion the charge that Dr. Campanella deliberately deserted plain *310 tiff without notice is totally unwarranted.
“Counsel for plaintiff contends that certain statements made by Dr. Campanella at the time he visited plaintiff in her hospital room on the sixth day following the surgery was an admission of the negligence of Dr. Banner-man and Dr. Means, and indirectly of his own negligence. He had interrupted his vacation briefly to return to Baton Rouge for a social function in which his daughter was participating, and he made an unscheduled visit to plaintiff. He freely admits that when he saw plaintiff he was surprised, shocked and disappointed, and that he expressed feelings in strong terms, followed immediately by the institution of procedures which appeared to him to be indicated. This was prior to his examination of the hospital records or any consultation with either of his associates. Later, he conferred with Dr. Bannerman and found that Dr. Bannerman had earlier recognized the worsening of plaintiff’s condition and had set in motion the steps which in his opinion were necessary to combat it.
“ ‘It is in connection with the events just mentioned that counsel for plaintiff has invoked the ‘excited utterance’ doctrine. The writer has no quarrel with this doctrine, but is of the opinion it is not applicable here.
“Dr. Campanella explained his excited utterances as due to the fact that plaintiff’s condition was so completely unanticipated and unexpected that his Latin blood involuntarily spoke out. He further testified that his examination of the hospital records and his consultations with his associates satisfied him that plaintiff’s condition on June 21, 1961 could not have been anticipated or expected by either Dr. Bannerman or Dr. Means prior to that date.
“Viewed in the light of the applicable jurisprudence, it is my opinion that the evidence here fails to establish liability on the part of any of the defendants.”
This Court is in agreement with the holding of the Trial Judge that the plaintiffs failed to establish liability on the part of any of the defendants in this case.
With regard to the question of Dr. Campanella’s alleged liability resulting from his leaving on vacation immediately after the operation, it should be pointed out that Dr. Campanella and Dr. Bannerman continued to treat Miss Uter through December of 1961, which certainly is indicative of the fact that her parents had not lost confidence in the doctors immediately after the operation as they would have the Court believe. While it is true that Dr. Campanella’s action in leaving town immediately after the operation might not be in the highest tradition of the medical profession, nevertheless the record does not disclose any evidence that the patient would have received better care had he remained.
For the above and foregoing reasons, judgment of the Trial Court is affirmed.
Affirmed.
Rehearing denied.
ELLIS and BAILES, JJ. dissent from refusal to grant a rehearing.