192 So.2d 100

**Lawrence A. UTER, Individually and as Natural Tutor of the Minor, Candace C. Uter,**

v.

**The BONE AND JOINT CLINIC et al.**

No. 48172.

Nov. 7, 1966.

Rehearing Denied Dec. 12, 1966.

Benton & Moseley, Edward Donald Moseley, Baton Rouge, for appellants-relators.

Maurice J. Wilson, Breazeale, Sachse & Wilson, Edward W. Gray, Percy, Macmurdo & Gray, Baton Rouge, for defendants, appellees-respondents.

FOURNET, Chief Justice.

Lawrence A. Uter, individually and as natural tutor of his minor daughter, Candace C. Uter, instituted suit to recover judgment for damages suffered by her, and also for expenses incurred by him, as a

result of the alleged malpractice and negligence of the defendants [1] in performing a surgical operation on the daughter's leg; and, when the Court of Appeal for the First Circuit affirmed the judgment of the lower court dismissing the suit, we granted a writ of certiorari on the application of Mr. Uter and his daughter [2] to review the judgment of the Court of Appeal. See, 184 So.2d 304.

According to the facts as disclosed by the record, in 1955 Miss Uter was involved in an automobile accident, receiving a comminuted fracture of her right femur, which fracture was reduced and treated by Dr. Thomas Campanella and his associate Dr. Moss M. Bannerman. When Miss Uter commenced to develop what is known as a genu recurvatum, commonly referred to as a "back knee" condition, the Uters again consulted with Dr. Campanella for orthopedic advice. They were told the condition could only be corrected by a surgical procedure known as osteotomy, which consisted of breaking the tibia and fibula a few inches below the right knee, realigning the bones, and securing the new alignment by means of a long cast.

On June 8, 1961, Dr. Campanella was contacted by the family to discuss when the corrective surgery could be performed, and a few days later he was notified to schedule the surgery for June 15, 1961, in order that the daughter would recover from it in time to enter the fall semester at college. Miss Uter entered Our Lady of the Lake Hospital on June 14, 1961, where the surgery was performed by Dr. Campanella, assisted by his associate Dr. Richard B. Means. A couple of hours after the operation was completed, Dr. Campanella departed on a pre-arranged two-week vacation, leaving his associates Drs. Means and Bannerman in charge of the post-operative care.

The surgery was apparently a success in so far as it remedied the back knee defect, but it left Miss Uter with a total temporary paralysis of the peroneal nerves of her right leg, although this condition improved to the extent that the normal functions of the peroneal nerve system were restored with the exception of the deep branch of this nerve, which is permanently impaired. Thus Miss Uter has what is commonly known as a "drop foot."

1. Defendants in this action are: (1) The Bone and Joint Clinic, a Louisiana partnership composed of Dr. Thomas Campanella, Dr. Richard B. Means, Dr. Moss M. Bannerman, and their professional liability insurer, National Surety Corporation; (2) Our Lady of the Lake Hospital, Inc., and its liability insurer, Hartford Accident and Indemnity Corporation.

2. Prior to the trial of the case Miss Uter reached the age of twenty-one, and she was then substituted as a party plaintiff as to the claim for personal injuries and future medical expenses.

As a basis for recovery plaintiffs alleged that Dr. Campanella departed on his vacation without notifying the Uters of his intention to do so; and, further, alleged specific acts of negligence consisting of: (a) improperly cleansed and sterilized hospital instruments and facilities, (b) improper surgical incision and operation, (c) improperly applied cast and failure to cut the cast soon enough to relieve pressure and swelling, (d) failure to administer preventive swelling medication soon enough, and (e) performance of the operation when the patient's susceptibility to infection was greatest, with no effort made to build up her resistance prior to undertaking the operation. Alternatively, they alleged that the doctrine of res ipsa loquitur applied.

All defendants denied any negligence or liability on their part, the doctors and their insurer contending they were possessed of the required skill and competence to handle the case and that they used reasonable care and diligence along with their best judgment in applying that skill and care. The hospital and their insurer averred the hospital and facilities were as sterile and well kept as any in the community or locality, and that their employees were free from any negligence.

The district judge, relying upon the pronouncement of this court in Meyer v. St. Paul-Mercury Indemnity Company,[3] found the defendant doctors fully competent to undertake the operation and treatment in this case, and that they were not negligent in any manner. He also found the hospital was free from negligence in the operation of its facilities, and hence dismissed plaintiff's suit.

The Court of Appeal for the First Circuit in a well-considered opinion affirmed the judgment of the trial judge, expressing its full agreement with his holding in the light of the Meyer case, and in finding no liability on the part of any of the defendants.

As was pointed out in the Meyer case, according to the jurisprudence of this state the rule applicable to the care that must be exercised by physicians, surgeons, or dentists is that the law exacts of them only "that degree of skill and care which is usually possessed and exercised by practitioners of their profession in the same locality or community and makes it their duty to use reasonable care and diligence, along with their best judgment, in the application of their skill to the case before them." The court further declared that under this rule it is "incumbent on the physician, surgeon or dentist who becomes defendant in a malpractice case to show that he is possessed of the required skill and competence indicated and that in ap-

3. See, 225 La. 618, 73 So.2d 781, 1953.

plying that skill to the given case he used reasonable care and diligence along with his best judgment." As was also pointed out by this court in Phelps v. Donaldson,[4] physicians, surgeons, and dentists are not insurers of the results of treatment afforded patients.

In applying for writs to this court applicants assigned the following errors in brief: (1) "The Court of Appeal erred in concurring in the view of the trial court that all it had to do was to accept the conclusions of ultimate fact as testified to by the medical experts, without testing those conclusions in the light of all of the evidence and the conclusions and inferences which reasonably attach to it;" (2) "The trial court and the Court of Appeal erred in failing to give any consideration to the excited utterances and spontaneous declarations of Dr. Campanella upon his unanticipated return to Baton Rouge to see the patient, and in accepting the defendant doctor's explanation that his 'Latin blood involuntarily spoke out' rather than applying the rule of res gestae and the doctrine of excited utterances or spontaneous exclamations;" (3) "The trial court and Court of Appeal erred in failing to hold that the defendants were guilty of negligence which was the proximate cause of the unexpected and unforeseen result obtained in the operative process;" and, alternatively, (4) "the trial court and the Court of Appeal erred in failing to apply the doctrine of res ipsa loquitur to the facts presented in this case."

In oral argument, however, and more particularly in a supplemental brief since filed, counsel for plaintiffs concede the defendant doctors were well qualified and competent, belonging to an outstanding orthopedic firm in Baton Rouge. In urging that the decision be reversed they rely upon the negligent post-operative treatment of Miss Uter by the defendant physicians. Plaintiffs place much stress upon the spontaneous declarations made on the part of Dr. Campanella when, upon viewing Miss Uter's unanticipated condition on his return to Baton Rogue, he expressed surprise that the cast had not been cut and proceeded to cut it, claiming her condition was a result of negligence on the part of the attending physicians in not removing the cast sooner, as it was obvious from the hospital chart Miss Uter was suffering intense pain, which indicated infection had set in.

The first principal witness called by plaintiffs, Dr. Jack Wickstrom, a recognized specialist in the field of orthopedics from New Orleans, concluded, after examining Miss Uter's leg and reviewing her medical history, that the surgery did not damage the peroneal nerve prior to its separation into its two branches, and that

4. See, 243 La. 1118, 150 So.2d 35, 1963.

the surgery did not cause impairment of the deep branch of the peroneal nerve. On cross-examination, Dr. Wickstrom testified Dr. Campanella possessed the required skill and competency to undertake the osteotomy and that Doctors Means and Bannerman possessed the required skill and competency to undertake the post-operative care of Miss Uter. He was also allowed, over strenuous objection of the plaintiffs, to give his appraisal of the post-operative care of Miss Uter, during which he stated: "There's no evidence of neglect on their part, either of the nurses or of the doctors * * *." Testifying as an expert, Dr. Wickstrom stated that in spite of the absolutely sterile technique used there is a recognized risk of infection in operations such as the one performed on Miss Uter, the range being from one and a half to two per cent.[5]

After examining Miss Uter and reviewing her case history, Dr. William E. Smith, orthopedic specialist of Baton Rouge, also testified with respect to the qualifications of the defendant doctors and the post-operative care tendered by them. His testimony was, in substance, to the same effect as that of Dr. Wickstrom, both with regard to the competency and judgment of the three physicians in the performance of the operation, and also in connection with the post-operative care given the patient.

■ After reviewing the testimony of Dr. Richard M. Nunnally, specialist and pathology expert at Our Lady of the Lake Hospital, Dr. Perry L. Chesney, a qualified and recognized general surgeon practicing in Baton Rouge, and Dr. Albert L. McQuown, specialist and pathology expert, we find ourselves in complete agreement with the findings of the district court and the Court of Appeal that there is nothing in the record that would indicate negligence on the part of the hospital, the members of its staff, or its employees. Dr. Chesney further testified that after examining the hospital records he could find nothing to indicate any lack of judgment on the part of Dr. Campanella in performing the osteotomy.

The conclusion we have reached clearly disposes of plaintiffs' alternative plea of res ipsa loquitur.

For the reasons assigned, the judgment of the Court of Appeal is reinstated and made the final judgment of this court.

5. In corroboration, Dr. Albert L. McQuown, specialist and pathology expert, testified there is absolutely no way to prevent the onset of a staph infection even under the most favorable conditions.