REGAN, Judge.
The plaintiffs, Mrs. Diana Buras and her husband, Ronald Buras, filed this suit against the defendants, Howard K. Pedigo, M.D., Aetna Casualty & Surety Company, his liability insurer, Jackson L. Beebe, M.D., and St. Paul Fire and Marine Underwriters, Inc., his liability insurer, Joseph H. Nodruft, M.D., and Maryland Casualty Company, his liability insurer, Frank A. Hava, M.D., and St. Paul Fire and Marine Underwriters, Inc., his liability insurer, West Jefferson General Hospital and Fireman’s Fund Insurance Company, its public liability insurer, Lena Dyer and Underwriters at Lloyds, her liability insurer as nurse, Winthrop Laboratories, a division of Sterling Drug, Inc., Drs. Nod-ruft, Pedigo and Hava, a partnership d/b/a Anesthesia Department of West Jefferson General Hospital, and Dr. Joseph H. Nodruft and West Jefferson General Hospital, a partnership, d/b/a Anesthesia Department of West Jefferson General Hospital, endeavoring to recover the sum of $210,200.00 dollars, for medical expenses and personal injuries which they assert were incurred by Mrs. Buras as the result of the negligence of the defendants in administering a spinal anesthetic preparatory to Mrs. Buras’ undergoing surgery in West Jefferson General Hospital.
Each of the defendants answered and denied the accusations of negligence delineated in the plaintiffs’ petition and also disavowed that there existed a partnership between any of the defendant litigants. Dr. Nodruft additionally pleaded that any injuries incurred by Mrs. Buras were the result of an unavoidable accident.
Lena Dyer, the nurse, and her insurer filed a motion for summary judgment, and Winthrop Laboratories filed both an exception of no cause of action and a motion for summary judgment. Each of these motions were granted and the respective *377 defendants were dismissed from the suit. Following a trial on the merits, judgment was rendered in favor of all defendants except Dr. Pedigo and his insurer, Aetna Casualty and Surety Company, against whom the lower court rendered judgment in the amount of $50,000.00.
From that judgment Dr. Pedigo, Aetna Casualty and Surety Company, and Mr. and Mrs. Buras have prosecuted this appeal. In addition thereto, Mr. and Mrs. Buras have answered the appeal requesting an increase of the lower court’s award from $50,000.00 to $100,000.00.
At the inception of this opinion we hasten to point out that an analysis of the voluminous record posed for our consideration by virtue of this appeal convincingly discloses to us that all of the defendants with the exception of Dr. Pedigo and his liability insurer were free from fault, and they are therefore not liable to the plaintiffs either personally or vicariously as the result of the alleged existence of a partnership between some of them. The record also convinces us that if the plaintiff was injured as the result of negligence, the only person who could be guilty of fault is Dr. Pedigo. This appeal therefore addresses itself principally to the question of Dr. Pedigo’s negligence.
The record reveals that on October 4, 1966, the plaintiff, Diana Buras, underwent a hysterectomy in West Jefferson General Hospital. The surgical procedure was performed by Dr. Jackson L. Beebe, a specialist in the field of gynecology. On the evening of October 3, 1966, Dr. Hava, a member of the department of anesthesiology in West Jefferson General Hospital, visited the plaintiff and discussed with her the various methods of administering anesthesia for her surgical procedure the following day. After a brief discussion, it was decided that she would undergo a spinal anesthesia in lieu of a general anesthetic. The plaintiff was properly prepped the night before for the impending operation, and on the morning of October 4, she was given appropriate sedation. When she was brought into the operating room she was instructed to lie on her left side, after which she was placed in a position, referred to in the record as a “boiled shrimp position,” so that her spinal column would form a convex curve. After positioning the plaintiff, Dr. Pedigo scrubbed, returned to the operating room, slipped on rubber gloves, and the plaintiff’s back having been sterilized in the appropriate areas, inserted a 20 gauge needle into her back. Upon the insertion of this needle the plaintiff manifested pain, the degree of which is in dispute. In any event, Dr. Pedigo immediately withdrew the needle, which he insists was inserted initially in the L-2, L-3 interspace and reinserted it at the L-3, L-4 inter-space. When the needle was in position, Dr. Pedigo then attached the syringe to it and injected an anesthetic consisting of a drug designated as Pontocaine mixed with 10% dextrose. The second insertion was uneventful, and the plaintiff was properly anesthetized as a result thereof. Thereafter she was turned on her back and Surital was administered intravenously in order to induce sleep.
From this point onward the only fact upon which the adversaries could agree was that Dr. Pedigo would have been negligent and guilty of medical malpractice if he did in fact puncture Mrs. Buras’ spinal cord when he inserted the first needle.
In support of the plaintiffs’ position they introduced the testimony, taken in New York by deposition, of Dr. Lawrence I. Kaplan, a specialist in the field of neurology and psychiatry, who examined the plaintiff from October 23 to October 26, 1967, in the New York Hospital for Joint Diseases. He testified that he performed three separate examinations of the plaintiff with identical results. Pie related that she was afflicted with a limp and weakness of the left leg, including the muscles of the knee and ankle, which weakness manifested itself especially on dorsi- *378 flexion. He found no left knee or ankle jerk and discovered that the plaintiff had no sense of pain or temperature whatsoever below the knee and a diminished sense of pain and temperature on a band of skin area on the front and side of her left thigh extending up to the area of L-2 through S-2. He ascertained that her sense of touch and vibration were intact and that she could sense movement and had position sense with her eyes open. For this reason, he observed that while she possessed a limp she did not use her leg “like that of a flail limb.” The doctor was of the opinion that the plaintiff suffered a lesion of the lower end of her spinal cord as a result of damage thereto by the needle puncture at the time she was administered the spinal anesthetic by Dr. Pedigo. He explained that the spinal cord puncture resulted in hematomyelia, which is a bleeding into the spinal canal. The edema resulting from this bleeding produced selective sensory difficulties which also spread as a result of the edema to some motor elements. However, when the edema subsided the area of the spinal cord known as the anterior horn cells were no longer involved, and the plaintiff was thus able to move her leg completely. Dr. Kaplan was also of the opinion that the physician who administered the spinal anesthetic was at fault and it was his judgment that the tap was in fact attempted at the level of D-12 rather than L-2 as contended by the defendant. He concluded that the plaintiff was permanently disabled and estimated her disability at between 1/3 to i/¿ of the total function of her body. Moreover, he explained that the plaintiff’s pain could possibly last for the remainder of her lifetime, and that the only possible relief which could be afforded her would be to perform a cordotomy, a neurological procedure which destroys nerve pathways to the pained areas. The doctor reiterated that the plaintiff manifested no significant atrophy of her left leg for the reason that she was obese and because, after the edema resulting from the bleeding of the spinal cord subsided, the anterior horn cells were no longer impaired and the plaintiff regained the ability to move her leg.
The plaintiffs also introduced the testimony by deposition of Dr. Robert D. Leffert, an orthopedic specialist with a subspecialty in orthopedic neurology. Dr. Leffert examined the plaintiff at the Hospital for Joint Diseases and performed an electromyogram to both legs. He explained that this test was thoroughly objective and by virtue of the injection of needles and the use of a oscilloscope, permitted him to obtain, observe, measure, and study the electrical discharges of the plaintiff’s leg muscles. He was of the opinion that Mrs. Buras was suffering from a spinal cord lesion in the left half of the spinal cord at the level of L-2 to S-2.
Dr. Richard M. Paddison, a specialist in neurology visited the plaintiff on August 5, 1968, and after reviewing her history and performing an independent examination concluded that her neurological disability is permanent in nature and that it was a direct result of the spinal puncture with damage to her spinal cord. He estimated her disability at 35% of her entire body.
Mrs. Buras testified that when the operation occurred she was a twenty-eight year old housewife, having given birth to seven children, ranging in ages from 12 to 2 years. She had no prior leg problems and had undergone an uneventful previous spinal anesthetic which had been administered by Dr. Nodruft. She related that when Dr. Pedigo made the first insertion she emitted a loud scream and her leg trembled. She said that she was in constant pain until she was overcome by the anesthetic and that she felt pain in her left leg in the recovery room. When she awoke in her own room, she immediately informed her husband of the incident and complained to him that the pain in her left leg was unbearable. Mr. Buras corroborated his wife’s testimony and then *379 added that on at least one occasion her left leg fell off the bed and that it had to be lifted back manually.[1]
In his own defense Dr. Pedigo testified that he administered to the plaintiff the spinal anesthetic and candidly conceded that the entire procedure was performed under his exclusive control. He, of course, denied that he placed the needle anywhere but at the L-2, L-3 interspace, at which time Mrs. Buras suffered what he termed a paresthesia, or sensation of electrical shock along a nerve as the result of contact therewith by the needle. He related and it is essentially undisputed, that par-esthesia occurs in many spinal taps of this nature and that it alone is not an indication of trauma. He pointed out that since he is extremely well experienced in administering spinal taps, he did not have to count vertebrae but reached the correct spinal level by placing his hand on the crest of the plaintiff’s ilium, dropping his thumb over to that interspace, which was the L-3, L-4 interspace, from which he moved up one space and made his initial insertion. He said that he chose the L-2 interspace for his initial injection because the anesthesia takes effect more quickly and avoids the necessity of tilting the table upward to anesthetize the upper portions of the patient’s torso, thereby making the breathing process more easy for an obese person such as the plaintiff.
Dr. Pedigo related that when paresthesia resulted, he immediately withdrew the needle, ascertained that the plaintiff’s pain had disappeared and then reinserted the needle at the L-3, L-4 interspace after performing another spinal wheal.[2] He testified that he visited the plaintiff in the recovery room and that she made no complaints -at that time. He said that a check revealed normal leg movements. However, he did concede that this test was performed at 11:25 a. m., and admitted that at 10:30 a. m., before he had done his post operative examination, Mrs. Buras had received a shot of morphine for pain. The doctor also related that since the nurse anesthetist, Mrs. Dyer, left for her vacation the next day, no post operative rounds were made to the plaintiff’s room after the operation, contrary to hospital routine. He did not see the plaintiff after his post operative examination in the recovery room, and he did not know exactly what time he had been notified that she was complaining of weakness and pain in her left leg.
Dr. Pedigo said that from the time he entered the operating room until the time he completed the spinal anesthesia procedure at the L-3, L-4 level, a total period of five or six minutes had elapsed. Thereafter, he visited another operating room to administer anesthetic, since four operative procedures had been scheduled for the same morning at 7:30 a. m. Despite the rapidity of the procedure and the admitted fact that he did not count vertebrae but instead arrived at the point of initial injection by hand measurements from the crest of the plaintiff’s ilium, Dr. Pedigo insisted that it was “not humanly possible that I misjudge the space I was in.”
Dr. Jackson L. Beebe, the gynecologist who performed the surgery, testified that while he had no independent recollection, it was possible that the plaintiff complained about her left leg on his first post operative hospital examination. Normal procedure in operations of the kind performed by him dictate that the patient, for her own good, be made ambulatory as rapidly as possible. He observed that on her first attempt, the plaintiff took one *380 or two steps, but in all fairness he said that it could not be classified as walking. However, on the second or third post operative day, the plaintiff was not able to walk on her left leg, and he had to prescribe the use of a metal walker in order to keep her ambulatory. He related that he had never previously encountered this condition after performing a hysterectomy and such a situation is not normal. Following her discharge from the hospital, he related that the plaintiff could walk by herself with weakness in her left leg, but he also noted that she could not have walked from her room to her automobile and that she could only have arrived at the situs of the automobile by use of a wheelchair. In response to a question as to whether or not he had ever indicated to the plaintiff or her mother that he thought there was a relationship between the spinal procedure and the plaintiff’s leg condition, the doctor replied :
“This again I can’t recall. I will say now Mrs. Buras had nothing wrong with her leg before she was operated on, following surgery she had a problem with her leg and I don’t feel like it came from my surgical procedure so obviously it must have had something to do with the spinal anesthetic.”
Dr. Pedigo also requested the appearance, on his behalf, of Dr. Richard Warren Levy, a neurosurgeon, who expressed the opinion that he did not believe that Mrs. Buras suffered from a lesion of her spinal cord. The primary reason which he offered for this conclusion was the fact that the findings of the degree of muscle weakness in her left leg varied from examiner to examiner, referring to the various examinations of the plaintiff by the physicians who testified either in person or by deposition. It is of interest to note, however, that when he was questioned about this particular aspect of the case, Dr. Richard Paddison, the neurologist who appeared on behalf of the plaintiff, explained her condition was stable, was consistent with trauma to the spinal cord, and then significantly added that the degree of severity of weakness found by a doctor is a subjective one which by its very nature varies with the individual doctor. It is also of significance to point out that Dr. Levy was employed by the defense in order to assist in its preparation of its case, and 'he actually journeyed to New York for the depositions of Drs. Kaplan and Leffert, and assisted the attorney for Doctor Pedigo in his cross-examination of these physicians over the objection of counsel for the plaintiff. Hence Dr. Levy’s testimony is not entitled to great weight for the reason that he assumed the position of an advocate as much as that of an expert witness.[3]
The defendant also requested the appearance of Dr. Paul McGarry, neuro-pathologist, who read the reports only and did not perform any examination at all upon the plaintiff. He testified that as a neuropathologist he had no clinical practice but instead dealt with the anatomy of the spinal cord only directly as a pathologist. It was his opinion, from a review of the medical reports, that the plaintiff did not suffer a lesion of the spinal cord and that her condition was caused by arachnoiditis, which is an inflammation of a membrane which covers the spinal cord.
The final witness who appeared on behalf of Dr. Pedigo was Dr. John Adriani, a respected specialist in the field of anesthesiology. Dr. Adriani expressed the opinion that the procedure followed by Dr. Pedigo was within the standard of care for physicians in the New Orleans community and that he did not believe that her condition was the result of a spinal *381 puncture. He too felt that her condition was arachnoiditis, but he readily and candidly admitted that he did not know how, when, or why this condition developed. He said that arachnoiditis was a slow procedure which resulted from the build-up of scar tissue around nerve roots, and that it did not manifest itself abruptly. He opined that the condition could not have preexisted the operation and that the spinal injection could have precipitated it. However, he reiterated that he could not say with medical certainty that -the..plaintiff was suffering from arachnoiditis.
The jurisprudence emanating from the appellate courts of this state is to the effect that the burden of proof is placed upon a physician in a malpractice case to show that he had that degree of skill and care which is usually possessed and exercised by practitioners of his profession in the same locality or community, and it is his obligation to use that skill with reasonable care and diligence, along with his best judgment, in the application of such skill to the case before him.[4] However, in Meyer v. St. Paul-Mercury Indemnity Co.,[5] the organ for the court reasoned that where the complaint is predicated on the charge that, during the rendering of the professional services, there occurred some untoward event, or some omission or act from which there resulted something not ordinarily found to occur during such treatment or operation, the physician or surgeon is then required to show that such unusual occurrence did not result from negligence on his part. In Herbert v. Travelers Indemnity Company,[6] the court noted that if the anesthesia was injected into the nerve root, which was contrary to the professional community standard by the concensus of all who testified, then the burden of exculpating himself from negligence passed to the defendant physician.
In this case it is likewise the con-census of all physicians who appeared herein that it would be contrary to the professional standards existing in this community to inject spinal anesthesia directly into the spinal cord. The testimony disclosed that an untoward event or act occurred during the administration Oof the spinal anesthetic, which resulted in the condition of which the plaintiff now complains, and that such condition does not ordinarily ensue from a normal routine administration of spinal anesthetic. Hence, the unusual event of the pain experienced by Mrs. Buras upon the initial insertion of the 22 gauge needle together with the loss of function of her leg (which obviously does not ordinarily result from a normal routine spinal anesthetic procedure) casts upon the defendant anesthesiologist the burden of proof relative to his freedom from negligence.[7]
The foregoing elucidation reveals that the principal question posed for the trial court’s consideration was one of fact, and that is whether Dr. Pedigo inserted the needle into the plaintiff’s spinal cord. The trial judge obviously accepted the findings of the plaintiff’s physicians together with her complaints and, therefore, concluded that Dr. Pedigo did not bear the burden of proof of freedom from fault.
The question which this appeal has posed for our consideration is whether that finding of the trial judge is so erroneous and unsupported by the evidence adduced herein so as to warrant a reversal by us.
We are of the opinion that no useful purpose would be served by indulging in a more protracted discussion of the foregoing testimony or by endeavoring to reconcile the contradictory evidence offered by the respective litigants. The trial *382 judge accepted the medical evidence adduced on behalf of the plaintiff as showing fault on the part of Dr. Pedigo and our analysis of the voluminous record convinces us that the evidence is of such a nature as to disclose no manifest err.or in the lower court’s judgment with respect to liability and the amount of damages awarded to the plaintiffs.
For the foregoing reasons the judgment appealed from is affirmed. Dr. Pedigo and Aetna Casualty Insurance Company are to pay all costs incurred herein.
Affirmed.

. The testimony of Dr. James Killian was also introduced on behalf of the plaintiffs. Dr. Killian performed an eleetromyogram and a nerve conduction test. His findings were essentially similar to those of Dr. Deffert, but he was unable to say whether the injury involved the nerve roots or the horn cells of the spinal cord.

. A spinal wheal is merely the deadening of the skin in the area of the interspace to lessen the pain on insertion of the large spinal needle.

. In Herbert v. Travelers Indemnity Company, La.App., 239 So.2d 367 (1970), the court similarly was not convinced of the objectivity and lack of bias of one Dr. Clifford McIntyre, of Fort Lauderdale, Florida, who was a specialist in neurology and psychiatry and also held a degree in law.

. See Foster v. St. Paul Fire and Marine Insurance Co., La.App., 212 So.2d 729 (1968); Uter v. Bone and Joint Clinic, 249 La. 851, 192 So.2d 100 (1966).

. La.App., 61 So.2d 901 (1952).

. La.App., 193 So.2d 330 (1967), La.App., 239 So.2d 367 (1970).

. See Meyer v. St. Paul-Mercury Indemnity Co., supra; Herbert v. Travelers Indemnity Company, supra.