276 So.2d 794 (1973)
Warner Max ALEXANDER
v.
ALTON OCHSNER MEDICAL FOUNDATION et al.
No. 5363.
Court of Appeal of Louisiana, Fourth Circuit.
April 3, 1973.
Rehearing Denied May 15, 1973.
Writ Refused June 29, 1973.
*795 A. S. Cain, Jr., Charles J. Lange, and Dean A. Andrews, Jr., New Orleans, for plaintiff-appellant.
Adams & Reese, Henry B. Alsobrook, Jr., New Orleans, for defendants-appellees.
Before REDMANN, GULOTTA and SCHOTT, JJ.
SCHOTT, Judge.
The plaintiff appeals from a judgment dismissing his suit against Alton Ochsner Medical Foundation, Ochsner Clinic and three physicians associated with those entities, Dr. Kenneth Meyer, Dr. Hurst B. Hatch, Jr. and Dr. Joseph K. Bradford. The case was tried to a jury resulting in a unanimous verdict for the defendants.
In his petition, plaintiff alleged alternatively that the defendants, including the three physicians named, as well as other physicians associated with them, in the period between April 20, 1967, and May 5, 1967, violated an agreement made with him in that the treatment afforded him was not performed in accordance with the standard of professional skills and care prevailing in the community and were negligent in that they failed to exercise ordinary care and skill required of them. In this Court, plaintiff contends that the defendants failed to use various processes and facilities to minimize his pain during the course of their treatment, thereby failing to render to him treatment which the community has a right to expect and thereby violating an implied warranty existing between plaintiff as a patient and defendants.
In addition, plaintiff complains that the trial judge's instructions to the jury were defective as a matter of law, because of, 1) the judge's failure to give certain special charges submitted by plaintiff's counsel and, 2) the inclusion of one particular paragraph in the general charge.
Plaintiff's counsel did not object to the general charge in the trial court so that he is precluded from that assignment of error in this Court under the provisions of LSA-C.C.P. Art. 1793. As to the trial judge's failure to give the special charges submitted by plaintiff, about which timely objection was made, a review of the general charge satisfies us that the jury was correctly and adequately instructed on the law in the context that the trial judge has the responsibility to avoid confusing the *796 jury and the right to use whatever semantics may be appropriate and necessary for this purpose. Lauro v. Travelers Insurance Company, 261 So.2d 261, 4th Cir. 1972.
On April 20, 1967, plaintiff was admitted to the defendant hospital by defendant, Dr. Hatch, who had found that the plaintiff was suffering from a spontaneous pneumothorax, a condition in which air has escaped from the lung into the space between the lung and the chest wall as a result of the rupture of a blister on the surface of the lung. This condition had first manifested itself on April 13, 1967, when plaintiff complained to Dr. Hatch that two days prior thereto he had an onset of stabbing pain in the mid sternal region, aggravated by breathing and by changing his position from lying prone. The doctor, on the basis of X-ray studies, diagnosed a 10% pneumothorax and prescribed bed rest and medication. Plaintiff was told to return in a week or sooner if his condition worsened. When he returned on April 20, 1967, and X-ray studies revealed that the condition had worsened Dr. Hatch consulted with defendant, Dr. Kenneth Meyer, of the Surgery Department of Ochsner, whereupon the two physicians concurred that it was necessary to conduct a surgical procedure known as a thoracotomy.
This procedure performed by Dr. Meyer consists of the insertion of a catheter through the wall of the chest and into the space between the lung and the interior chest wall so that air can be aspirated from that pleural space. As the air is removed the lung re-expands and becomes sealed with the result that the leakage of air from the lung is gradually eliminated. The insertion of the tube is accomplished by means of a local anethesia being administered, followed by an incision in the chest, the slant of which controls the direction to be followed by the catheter. A steel trocar or needle tube containing the catheter itself is then used to penetrate the chest muscle and chest wall. When the desired position is reached the trocar is removed leaving the catheter in place with the outside end of the catheter then connected to a suction apparatus.
This procedure was carried out at 4:30 PM on April 20, 1967. The nursing notes show that on April 21 at 12:45 PM plaintiff was complaining of severe pain above the site of the insertion in the chest and "cannot move legs, arms or head without pain." Dr. Meyer testified that when this report came to his attention he examined the plaintiff, finding that he was able to turn and move with ease as he was requested to do in order for him to carry out his examination. A chest X-ray was taken and thereafter the position of the catheter was changed. The doctor explained that by this time most of the air in the pleural space had been removed but there was still fluid on the periphery of the space. The tube had to be repositioned in order to place one of the holes in the tube in the particular space where the fluid was located. He explained that in addition to the hole on the end of the catheter additional holes were placed in the catheter so as to make the removal of the air more effective. Plaintiff was seen by Dr. Hatch daily while in the hospital until May 1. By April 30 he felt that there was no more leakage from the lung so that the catheter could be removed, but on consultation with Dr. Meyer it was decided to leave the catheter in place for a short while longer. On May 1 Dr. Hatch's responsibility for the plaintiff was assumed by defendant, Dr. Bradford, to whom it was apparent by May 2 that plaintiff's lung had re-expanded completely, so that it was time for the catheter to be removed from his chest, and this was confirmed by X-ray examination. The catheter was removed on May 4 and plaintiff was discharged from the hospital on May 5 with no problems of mobility. Dr. Meyer and Dr. Bradford both testified that the procedure followed, and the treatment administered, was in accordance with standard medical practice in the City of New Orleans. Dr. Bradford further testified *797 that Drs. Hatch and Meyer both have the necessary training and skill to have treated plaintiff.
In his petition, plaintiff alleged that it was during this period of hospitalization that the defendants failed him in some contractual obligation and were negligent in their treatment of him. He contends that he suffered severe pain and discomfort during this period; that somehow the defendants were derelict in their duty to alleviate his suffering; that this suffering continued after his discharge from the hospital and eventually caused him to lose his employment and to continue to suffer all the way up until the time of the trial.
Plaintiff did not testify at the trial except to identify his doctor and hospital bills, and the only evidence of his suffering is contained in the testimony of the doctors as they recited from their records the complaints made to them by plaintiff.
The jury heard the testimony of ten different physicians who testified at the trial of the case. Dr. Hatch who had been treating plaintiff since April, 1962, for various illnesses including tuberculosis, continued to treat the plaintiff after the thoracotomy until March of 1969. Because of continued complaints throughout this period he prescribed medication, had him examined by and consulted with other physicians, including Dr. Merrill Hines, and became convinced that plaintiff's pains were psychogenic and suggested that he see a psychiatrist for treatment. This view was shared by Dr. Meyer on the basis of plaintiff's behavior in the hospital.
Dr. Hines had treated plaintiff over a period of 10 or 15 years as his family physician and also felt that plaintiff had emotional problems and recommended psychiatric treatment.
Plaintiff was examined by Dr. Charles L. Brown, Jr., on May 19, 1969, and upon initial examination of plaintiff followed by complete tests in the Baptist Hospital in July, 1969, and consultation with a neurologist, an orthopedic surgeon and a lung specialist, could find no explanation for the complaints and concluded that plaintiff's problems were emotional requiring psychiatric treatment. Dr. Brown reviewed the records of the Ochsner Clinic and the work done by Drs. Hatch, Bradford and Meyer, and concluded that nothing they had done indicated any deviation from the proper medical care.
Plaintiff was treated by Dr. William Leon from December 2, 1969, until February 26, 1971. Plaintiff was given tests at Touro Infirmary, Dr. Leon consulted with an internist, Dr. Joseph Schenthal, and a neurosurgeon, Dr. Raeburn Llewellyn, but could find no objective findings to explain plaintiff's subjective complaints of chest pains, which plaintiff told him had been occurring for two and a half years since his pneumothorax. Dr. Leon, too, felt that plaintiff should get psychiatric care, and he testified that based upon the history that plaintiff had given to him, as well as the review he made of the medical records, he could find no dereliction of duty or breach of the standard of care or of medical practice on behalf of defendants.
Dr. Schenthal who examined plaintiff on January 5, 1970, and in October, 1971, testified that he could find no physical reason to account for the pain about which plaintiff complained. In his opinion the pain was involved with emotional components requiring the attention of a psychiatrist. In his opinion, Drs. Hatch and Bradford were "topnotch" in their fields, as well as Dr. Brown and others at the Ochsner Clinic who had examined plaintiff.
Dr. Llewellyn, who examined plaintiff on January 6, 1970, testified that the exposing of the nerves in the chest wall by the procedures followed during the thoracotomy were not the basis of plaintiff's complaints. He could not find what was causing plaintiff's pain.
Plaintiff did see Dr. Millard Jensen, a psychiatrist, on March 23 and April 4, 1971, who testified that plaintiff was suffering *798 from a great deal of anxiety, he was under stress, and he had paranoid tendencies. He felt that the pain he described was psychogenic in origin, especially since the other physicians could not find any physical reason for the pain. He recommended further psychiatric help but plaintiff stated that he didn't need any help in that area, and his attitude was that he knew what his problem was and that surgical correction was the only answer for the problem.
Finally, Dr. George Welch, a specialist in internal medicine, examined the plaintiff on August 6, 1971, and expressed the opinion that the pain about which plaintiff was complaining was not related to the treatment he got at Ochsner Clinic and was psychogenic or emotional in origin.
With respect to plaintiff's position that the defendants committed a breach of contract, we are guided by the following principles enunciated in Phelps v. Donaldson, 243 La. 1118, 150 So.2d 35:
"We think the general rule universally obtaining on the subject matter is that: `When a physician undertakes the treatment of a case he does not guarantee a cure, nor is any promise to effect a cure or even a partial healing to be implied, nor does the law raise from the fact of employment an implied undertaking to cure, but only an undertaking to use ordinary skill and care. For this reason a physician cannot be held up to a standard of civil responsibility similar to that of engineers, mechanics, and shipbuilders. Of course a physician might contract specifically to cure and he would be liable on his contract for failure, but, in the absence of such a special and peculiar contract, the fact that treatment has resulted unfavorably does not even raise a presumption of want of proper care, skill, or diligence. * * *' 21 R.C.L. Sec. 36, p. 391. Also, see 70 C.J.S. Physicians and Surgeons § 57, pp. 981, 982 `A dentist, like a physician or surgeon, is not an insurer or guarantor of results, in the absence of express agreement.' 41 Am.Jur., Physicians and Surgeons, Sec. 104, p. 219."
There is no evidence of any expressed contract to cure. The testimony of defendant physicians standing alone is sufficient in this case with respect to implied warranty to show that they did use ordinary skill and care and their testimony is corroborated by the testimony of every other physician who reviewed their procedures and approved of same. Plaintiff attempts to contradict this testimony by suggesting that X-ray photographs taken by Drs. Hatch and Meyer were inadequate in that they did not reveal the depth into the chest cavity which the catheter reached. He speculates that this caused his suffering. But Dr. Leon thoroughly discredited this theory as a cause for plaintiff's problem. Plaintiff's argument that additional X-ray photographs should have been taken and that additional procedures, such as fluoroscoping and other tests, should have been implemented is not supported by any testimony, medical or lay. The real nub of the plaintiff's position seems to be that he was in pain at the beginning and continued to be in pain at the time of the trial; therefore, a breach of contract was committed by defendants who had undertaken to treat him, but the law does not exact upon the physician a guarantee to cure anyone. Furthermore, the pain and discomfort described in the nursing note of April 21 are fully explained by Dr. Meyer who testified that a thoracotomy necessarily causes a patient to be uncomfortable as long as the catheter remains inserted and discomfort continues even after the patient is discharged from the hospital because of the incision and irritation to the lining of the lung and chest wall. Finally, the testimony of almost every physician who appeared at the trial, as well as numerous consultants to whom reference was made by those physicians, compels a conclusion that plaintiff's pain was not the result of *799 defendants' actions but was psychogenic or emotional requiring psychiatric treatment for a cure.
As to the allegations of negligence on the part of defendants, their conduct must be judged on the basis of whether they exercised that degree of skill and care which is usually possessed and exercised by practitioners of the profession in the same community, it being their duty to use reasonable care and diligence along with their best judgment in the application of their skill to the case before them. Uter v. Bone and Joint Clinic, 249 La. 851, 192 So.2d 100, and Meyer v. St. Paul Mercury Indemnity Company, 225 La. 618, 73 So.2d 781. When this test is applied to the conduct of defendants, the evidence is overwhelming to the effect that all of the physicians who are named defendants, as well as those personnel of Ochsner Clinic and the other entities who treated plaintiff, discharged their duty to him.
Affirmed.