261 So.2d 261 (1972)
Elena Anna LAURO et vir
v.
The TRAVELERS INSURANCE COMPANY et al.
No. 4874.
Court of Appeal of Louisiana. Fourth Circuit.
April 18, 1972.
Rehearing Denied May 16, 1972.
Writ Refused June 15, 1972.
*263 Darden, Screen & Trice, Phil Trice, New Orleans, for plaintiffs-appellants.
Jones, Walker, Waechter, Poitevant, Carrere & Denegre, John V. Baus, New Orleans, for defendants-appellees, Dr. Evelyn B. Nix and The Travelers Ins. Co.
Deutsch, Kerrigan & Stiles, Dermot S. McGlinchey, New Orleans, for defendant-appellee, Ins. Co. of North America.
Before REDMANN, GULOTTA and BOUTALL, JJ.
GULOTTA, Judge.
This is an action for damages based on an erroneous diagnosis while Mrs. Elena Lauro Iseman was undergoing surgery at Mercy Hospital on November 14, 1968. Plaintiffs allege that Dr. Evelyn Nix, a pathologist, was negligent in wrongfully diagnosing tissue removed from a lump in Mrs. Iseman's breast as scirrhous carcinoma, a malignancy, in lieu of granular cell myoblastoma, a benign tumor; resulting in the removal of her breast. Plaintiffs further allege that Mercy Hospital was also negligent in failing to furnish its Pathology Department with modern equipment, more particularly a cryostat in place of the freezing microtome system, for aiding the pathologist in cutting sections used for diagnostic purposes. Were the cryostat used, a more suitable section could have been cut resulting in a more accurate diagnosis. *264 Defendants, Travelers Insurance Company and Insurance Company of North America, are the respective insurers of Dr. Nix and Mercy Hospital. This appeal is from a jury verdict dismissing plaintiffs' suit.
The substance of appellants' contention is that the trial judge erred by improperly excluding certain evidence offered by plaintiffs while allowing the introduction of certain inadmissible evidence offered by defendants and further by commenting on the evidence to plaintiffs' prejudice, as well as by improperly charging the jury. It is contended that the action of the court thus led the jury to its manifestly erroneous determination.
Before considering the particular complaints concerning the action of the trial judge, we shall first concern ourselves with the facts and circumstances surrounding the alleged negligence. Those facts are that Dr. Raymond Schwarz diagnosed the condition as a "strong possibility" of malignancy and scheduled Mrs. Iseman for an excisional biopsy. He removed the tumor from the breast and sent the tissue to Dr. Nix whose responsibility was, as a pathologist, to diagnose the tissue and report her findings. This procedure is followed while the patient is under anesthesia and while undergoing the surgery.
After making a frozen section diagnosis of the breast tissue, Dr. Nix reported it as scirrhous carcinoma (a malignant cancer) whereupon Dr. Schwarz immediately proceeded with a radical mastectomy or removal of the entire breast and surrounding tissue.
The day after surgery had been performed, Dr. Nix examined the then available permanent paraffin section[1] and determined that the tissue was not scirrhous carcinoma but rather granular cell myoblastoma, which is not malignant.

ERROR OF TRIAL JUDGE
Plaintiffs assign specific error by the trial judge in excluding evidence which they sought to introduce by sustaining objections to plaintiffs' offer. Despite this complaint, it is noteworthy that no proffer of evidence was made by plaintiffs. Furthermore, the record reveals that plaintiffs often succeeded in eliciting the evidence sought during subsequent questioning after objections had been maintained and in other instances the court properly excluded the evidence.[2]
*265 Moreover, we equally find no merit in plaintiffs' assertion that the trial judge permitted the introduction of evidence by defendants prejudicial to plaintiffs' interest. While the court's action in permitting a reference to a medical journal without the journal being placed in evidence and a further reference to a conversation with a Dr. Byers when Dr. Byers was not available for cross examination might have been questionable, such error was, in our opinion, harmless.[3]
When examining a record of the proceedings in the trial court, it is not only conceivable but probable that error would be detected. While it is the responsibility of the appellate court to ascertain if error has been committed, it is important that the error detected be weighed to determine whether such error is harmless or prejudicial. We find herein no such prejudicial error in the evidentiary rulings of the trial judge.
We are also cognizant that a trial judge should studiously seek to avoid commenting on evidence. However, after examining counsel's complaints as to specific statements of the trial judge, although we are of the opinion that the court did on more than one occasion comment on argument of counsel for the plaintiffs,[4] these comments did not, in our opinion, constitute prejudicial error.
Were we to conclude that the comments of the trial judge were prejudicial and that the jury's findings were contrary to the record, then we could with reason conclude that those comments might have led the jury to manifest error. On the other hand, when the record supports the verdict, then we cannot conclude the comments of the trial judge had any undue effect on the conclusions of the jury.
The contention that the trial judge erroneously refused to give plaintiffs' requested charges to the jury is also without merit. There was a sound basis for refusal, i. e., either the charge was covered in the general charge, or the wording of the charge was changed or additions made to more accurately state to the jury the applicable law.
Plaintiffs additionally assert that the trial judge should not have given two of defendants' requested charges. The first of these stated: "A physician is not obligated to always be right in making a diagnosis. It is not malpractice to miss a diagnosis. Making a diagnosis is an act of professional judgment and may not be considered as an act of negligence. This is *266 for you to decide." We find no error here, as the charge reflects the law.[5]
The other charge objected to stated that the jury must be guided by the views and opinions of experts as to whether the degree of care used is that which is ordinarily possessed and exercised by other pathologists in this community. Plaintiffs' counsel objected to the inclusion of the word "must". Granted, "must" is a strong word to use; however, we are of the opinion that this charge also reflects the status of the law and was thus properly given. Meyer v. St. Paul-Mercury Indemnity Co., 225 La. 618, 73 So.2d 781 (1953); Steinberg v. Indemnity Insurance Company of North America, 364 F.2d 266 (5th Cir. 1966).
Clearly, it is the duty of the judge to charge the jury as to the law applicable in that case. Furthermore, the court has the corollary right and responsibility to require that the jury receive only the correct law applicable. Thus, it is the trial judge's responsibility to reduce the possibility of confusing the jury; and in the final analysis, he may exercise the right to decide what law is applicable and to prevent counsel from arguing law which he deems inapplicable. Little v. Hughes, 136 So.2d 448, 451 (La.App. 1st Cir. 1961); Presley v. Upper Mississippi Towing Corporation, 141 So.2d 411, 416 (La.App. 1st Cir. 1962).

LIABILITY OF DR. NIX
The standard of care owed by Dr. Nix in the instant case is to exercise that degree of skill ordinarily employed, under similar circumstances, by the members of her profession in good standing in this community. As a physician, she is not required to exercise the highest degree of skill and care possible, but to use reasonable care and diligence along with her best judgment. Uter v. Bone and Joint Clinic, 249 La. 851, 192 So.2d 100 (1966); Meyer v. St. Paul-Mercury Indemnity Co., supra, and cases cited therein.
For Dr. Nix to be liable, she must have violated this standard. Clearly, the testimony of other experts in the field is the best evidence of what the community standards for a pathologist are. Dr. Charles Dunlap, chairman of the Department of Pathology at Tulane University School of Medicine; Dr. Monroe Samuels, a pathologist; and Dr. William H. Harris, Jr., also a pathologist, testified at the trial. These experts indicated that the procedure followed by Dr. Nix was customary and that in preparing the frozen section for examination under a microscope, the exact thickness of the section is not always paramount, but whether or not the section is representative and useful for diagnostic purposes. If the tissue is cut thin enough to see the cells and if the stain is adequate, the frozen section is of diagnostic quality.
We are convinced by the experts' testimony, particularly Dr. Dunlap's, that it was not unreasonable for Dr. Nix to diagnose the frozen section as scirrhous carcinoma. The distinguishing visible feature between these two growths is the tiny granules present on granular cell myoblastoma. Dr. Dunlap stated that these tiny little granules would not have been visible under frozen section, although they were later apparent on the permanent paraffin section. Dr. Nix did not have the paraffin section available when making her diagnosis but was, as is customary, working with a frozen section to insure quick results as a benefit to the patient waiting in surgery.
It is standard procedure for the pathologist to report his findings based on the frozen section as soon as possible to the surgeon. The emphasis on speed is to reduce *267 the risk that a malignant growth would spread. According to Dr. Dunlap, it is, therefore, customary to proceed to surgery based on the diagnostic report of a frozen section because delay is undesirable, and it is beneficial to the patient that everything be done in one operation rather than two.
It is important to note that scirrhous carcinoma is a common cancer found in the breast. Granular cell myoblastoma is rarely found in this part of the body.[6] This fact, coupled with the fact that the granules were likely not to be visible under the frozen section, and that the two growths are similar in appearance, leads us to conclude that it was not unreasonable for Dr. Nix to make a wrongful diagnosis, despite exercise of due care. We are convinced by the record that Dr. Nix used her best judgment and reasonable care in the procedure she employed for preparing the frozen section and her diagnosis of it. That an erroneous diagnosis resulted under these circumstances does not, in our opinion, constitute negligence.
While our sympathy for Mrs. Iseman cannot be overstated and as disturbing as the unfortunate result is, the record will not permit us to afford recovery to plaintiff. The entire procedure for diagnosis of frozen sections is uncertain and inconclusive and that is the reason why parafin sections are subsequently made and viewed. We simply are unable to find negligence on the part of Dr. Nix and cannot, based on the testimony adduced herein, cast her in judgment because of the imperfections of medical science.

LIABILITY OF HOSPITAL
Plaintiffs base much of their allegation of negligence on the use by Dr. Nix of a freezing microtome for cutting sections instead of a cryostat. It is their contention that the microtome supplied by the hospital is obsolete and that the advantage of a cryostat is that the pathologist can cut sections several microns[7] thinner with this instrument resulting in a more accurate diagnosis. However, at no time did the experts indicate that the microtome is an unsatisfactory device. To the contrary, the testimony establishes that a freezing microtome is a widely accepted and satisfactory instrument. Even plaintiffs' expert, Dr. Samuels, testified that the microtome can cut satisfactory sections. Thus, the use of a microtome did not, in our opinion, violate the care required of the hospital.
The duty owed by the hospital to its patients is to exercise the degree of care, skill and diligence used by hospitals generally in that community.
In Killgore v. Argonaut-Southwest Insurance Co., 216 So.2d 108, 110 (La.App. 2d Cir. 1968) the court set forth this standard:
"A private hospital is not an insurer of a patient's safety. Clarke v. Gowen Sanitorium, Inc., La.App., 160 So.2d 426 (2nd Cir. 1964); DeBlanc v. Southern Baptist Hospital, La.App., 207 So.2d 868 (4th Cir. 1968). The general rule as to the degree of care owed by a hospital to a patient is stated in 41 C.J.S. Hospitals § 8(3) pp. 349-350:
`The extent and character of the care that a hospital owes its patients depends *268 on the circumstances of each particular case. A private hospital owes its patients the duty of protection, and must exercise such reasonable care toward a patient as his known condition may require. The measure of duty of a hospital is to exercise that degree of care, skill, and diligence used by hospitals generally in that community, and required by the express or implied contract of the undertaking. * * * On the other hand, a private hospital is not an insurer of a patient's safety, and the rules as to the care required are limited by the rule that no one is required to guard against or take measures to avert that which a reasonable person under the circumstances would not anticipate as likely to happen.'" (emphasis ours)
Accordingly, we can find no basis for concluding that Mercy Hospital was negligent by not having a cryostat available for use by Dr. Nix nor that it violated the degree of care required.
We find no manifest error in the findings and conclusions reached by the jury herein. The judgment of the trial court is affirmed.
Affirmed.
REDMANN, Judge (dissenting in part).
I concur in holding the hospital not liable and dissent from holding Dr. Nix and her insurer not liable.
Everyone agrees that Dr. Nix misinterpreted the frozen section of plaintiff patient's tissue and gave a definite but incorrect diagnosis on the frozen section. Everyone agrees that that error cost the patient the "mutilating operation" she has experienced unnecessarily.
The only question is whether Dr. Nix's error was "fault", or "imprudence [or] want of skill", C.C. arts. 2315 and 2316, in which case the law obliges her to "repair", or pay some reparation for, the damage her mistake caused.
The law does not declare her incompetent or otherwise demean her because she makes a mistake. It only declares, in simple fairness, that she ought to bear the loss (since her mistake caused it) rather than the person whom her mistake injured.
When a greatly experienced, admittedly skillful, automobile driver makes a mistake and it causes injury, we do not excuse him from repairing the damage he causes because "it could happen to any competent driver" or because it is his first mistake in 20 years of driving. We say simply that he did something the reasonable driver should have known he should not do, and this is fault which makes him liable.
Here, the most that can be said is that the other pathologists can understand how the mistake could have occurred. But if all of them know that (in a non-excellently prepared frozen section) what may look like scirrhous carcinoma may be the benign myoblastoma, then that is the report that the reasonable pathologist should have given to the surgeon, rather than a definite diagnosis of carcinoma. That myoblastoma is very rare in the breast is immaterial:[1] the expert testimony is that the pathologist is relied on to distinguish the rare as well as the commonplace, and the rarity of myoblastoma means only that it is improbable, and not that issuing a definite misdiagnosis is the action of a reasonable pathologist.
The expert testimony of plaintiff's surgeon is that "Because [radical mastectomy] *269 is a very mutilating operation, the [pathologist's] diagnosis has to be unequivocal before you would proceed." And it is only "if the diagnosis is unequivocal, the report, it is the surgical opinion and feeling that it is better to proceed * * * to avoid spreading the tumor * * *."
Dr. Nix herself testified if there were "any doubt", a "responsible" pathologist would not report cancer to the surgeon.
Dr. Dunlap (head of Tulane University pathology) explained that the benefit to the patient of the speedy frozen-tissue diagnosis is that one operation is had instead of two and that "maybe a lot of delay" is avoided. Asked whether delay was harmful, he replied "It's undesirablea week or two is not of great importance." (My emphasis.)
In my opinion the expert testimony is to the effect that, despite the limitations on frozen section diagnosis, myoblastoma should have been diagnosed or at least the possibility of myoblastoma should have been recognized. One expert testified that since the permanent slides one day later showed it so clearly, "I think there should be no difficulty" if the frozen section slide were excellently prepared. (And I interject that when mutilation is at stake, a patient is entitled to excellent preparation.) Another said the frozen slide "may have shown the same thing [as the permanent], but perhaps not as closely." However, Dr. Dunlap did say that the "granules" of myoblastoma "probably would not have shown" in the frozen section, because "in order to demonstrate these granules a very perfect stain is needed." "[L]acking the granulator in the cells, I think it very easy to consider this as carcinoma. * * * In fact, I am awful glad I didn't have to examine this on the frozen myself. * * * I think I could have made a similar mistake myself, on this particular tissue, but I hope I wouldn't have. But I could have." (Emphasis mine.)
At the least, in my opinion, the expert testimony establishes that (1) frozen sections have limitations, in that the granules of myoblastoma may not be seen unless the slide is excellently prepared; (2) thus myoblastoma may have apparent similarity to scirrhous carcinoma and may be mistaken for it; (3) all of the pathologists know of this possibility of mistake (and I believe Dr. Nix should have known of it); (4) only where there is no doubt, and the diagnosis is unequivocal, does a cancer diagnosis go to the surgeon and does the surgeon mutilate by radical mastectomy; (5) a delay of a week or two in radical surgery is "not of great importance". In my judgment Dr. Nix should have realized the possibility of myoblastoma (she had had a myoblastoma on her pathology Board examination) and, in view of the awesome surgery that would result from her unequivocal diagnosis, she should not have returned an unequivocal diagnosis.
Her doing so breached her professional duty to plaintiff, and for the damages from that breach she (and her insurer) are liable.
NOTES
[1] The frozen section diagnosis is a fast procedure, but such diagnosis has limited accuracy. The hospital prepares a mounting of the tissue in a permanent paraffin section from which a diagnosis is made. This involves a longer preparation and thus cannot provide the basis for a quick diagnosis as does the frozen section.
[2] At one point, an objection was maintained when counsel for plaintiffs asked a hypothetical question of Dr. Schwarz: "If she [Dr. Nix] had reported back to you that this growth was benign, or that she could not tell whether it was benign or malignant, what would you have done?" However, later we note that the same question was asked and admitted only posed in a different way: "If Dr. Nix had reported to you during surgery that this was a granular cell myoblastoma, what would you have done?"

The court at another time sustained an objection to plaintiffs' questioning of Dr. Bourgeois: "Can you recall any instance in which any pathologist ever reported to you that a growth was malignant and it subsequently turned out that it was not malignant?" Plaintiffs were, however, subsequently allowed to rephrase the question and ask: "Is it customary for a pathologist to report that a growth is malignant after a frozen section of tissue is taken from the human breast, and it later turned out not to be malignant?" An objection was sustained when plaintiffs asked Dr. Nix: "Do you believe that in order to reduce the risk of error that every hospital ought to have a cryostat?" The Court properly sustained the objection on the grounds that the question was argumentative and the witness was not an expert in this area. Counsel for plaintiffs was allowed to ask many specific questions of Dr. Samuels, about various settings of the microtome, despite continuous objections by opposing counsel. During counsel for plaintiffs' examination of Dr. Albert Lauro, treating physician and brother of Mrs. Iseman, the witness related his face to face meeting with Dr. Nix, and the conversation between them. In his testimony, Dr. Lauro spoke of his disappointment that Dr. Schwarz was brought into the case and that he felt Dr. Schwarz was not responsible. The court ruled out, and we feel properly so, that part of the testimony which relates to Dr. Schwarz, as he was not a party to the suit.
[3] In Dr. Nix's reference to a Dr. Byers who was not present to testify and was not available, the reference to Dr. Byers was that Byers had stated that after seeing the permanent section, he had still diagnosed the tissue to be cancerous.

Testimony of defense witness, Dr. Harris, in making reference to an article or publication never produced in court in which 12 out of 23 pathologists interviewed stated that they had made a mistake in diagnosis on frozen section examination. Objected to by plaintiff, but overruled.
[4] The trial judge at one point commented during plaintiffs' argument regarding a witness's testimony:

"This is not what he said. No question about that. And the jury knows it."
"Counsel may inadvertently not purposely misquote. I hope he is not purposely misquoting that."
"That is not correct. You are now skirting the law. I will eliminate that." (Reference is made to plaintiffs' argument concerning the application of res ipsa loquiturjudge charged res ipsa loquitur.)
[5] Henry v. McCool, 239 So.2d 734 (La. App. 1st Cir. 1970); Leavell v. Alton Ochsner Medical Foundation, 201 F.Supp. 805 (E.D.La.1962) and cases cited therein.
[6] Dr. Dunlap, Dr. Nix and Dr. Schwarz all attested to the rarity of granular cell myoblastoma. Dr. Nix stated that in world medical literature as of 1963 there have been only about 49 cases of granular cell myoblastoma reported in the breast. In these 49 cases, 10 were based on frozen sections and 7 out of the 10 frozen sections were misinterpreted.

Dr. William H. Harris, a pathologist, also stated that granular cell myoblastoma, particularly in the breast, is one of the lesions in the breast that is difficult to diagnosis, even with the paraffin section.
[7] A micron is one-thousandth of a milimeter. The amount of thickness of a tissue section varies from 10-20 microns depending on technique and accuracy. Exact thickness of a tissue section cannot be determined by the pathologist.
[1] But it may be noted that of the 49 cases reported in an article Dr. Nix referred to, in only 10 was diagnosis attempted on frozen sections and of those 10 seven were misdiagnosed. These statistics would suggest that frozen section diagnosis of what may be myoblastoma is not the usual procedure and is unsatisfactory. Dr. Nix's knowledge of this article should have suggested she avoid frozen section diagnosis. Dr. Dunlap's estimate of the number of reported breast myoblastomas was "less than a hundred. I am not certain of that figure."