309 So.2d 706 (1975)
Delores Elaine GREEN, Individually and as administratrix of the Estate of her minor son, Robert Daniel Green, Plaintiff and Appellee,
v.
STATE of Louisiana, Through the SOUTHWEST LOUISIANA CHARITY HOSPITAL and/or the State Board and/or Department of Hospitals, Defendant and Appellant.
No. 4893.
Court of Appeal of Louisiana, Third Circuit.
February 26, 1975.
Rehearing Denied April 2, 1975.
Writ Refused June 13, 1975.
*708 Lawrence W. Bell, Baton Rouge, for defendant and appellant.
Allen, Gooch & Bourgeois by Raymond M. Allen, William J. F. Gearheard, Lafayette, for plaintiff and appellee.
Before FRUGE, CULPEPPER and DOMENGEAUX, JJ.
DOMENGEAUX, Judge.
This is a tort action brought against the State of Louisiana by the plaintiff who avers that her minor son was severely incapacitated as a result of the alleged failure of a physician employed by the defendant at the Lafayette Charity Hospital, Lafayette, Louisiana, to properly diagnose and treat her son's condition. From a judgment in favor of the plaintiff, the State of Louisiana has appealed. Plaintiff answered the appeal seeking an increase in the amount of damages awarded by the trial court.
The facts leading up to this suit are as follows: On Friday, September 24, 1971, nine year old Robert Green received a small scratch on the shin of his right leg when he fell either against an old washing machine or from a tree while playing. Shortly thereafter his mother administered first aid to the scratch with application of some salve and a bandaid. Following the incident Robert did not complain about the injury until two days later, about 4 o'clock P.M. Sunday afternoon. At this time he mentioned soreness in the leg and his mother noted a slight fever and what seemed to be a bruise around the scratched area. By 8 P.M. that same night the leg began to swell and appeared infected around the bruise, so Mrs. Green immediately transported Robert to the emergency room at Lafayette Charity Hospital, where he was seen somewhere between 10 and 12 P.M. The admitting room physician was Dr. Prapidabi Chandradibya, who was practicing medicine under a temporary institutional permit granted to foreign graduates by the Louisiana State Board of Medical Examiners. The doctor took a brief medical history of Robert from his mother and noted upon physical exam a temperature of 101, in addition to "marked swelling and tenderness of the right leg and discoloration at the area". Additional diagnostic examinations consisted of a blood count, urinalysis, blood culture, and an x-ray of the leg. Robert was also administered a tetanus shot and an antibiotic, the latter as an alternative to penicillin which the boy was allergic to. Doctor Chandradibya arrived at a clinical diagnosis of cellulitis (infection or inflammation) and determined from examination of the x-ray that there were no broken bones or foreign bodies present in the leg. Thereafter the doctor gave Mrs. Green a prescription for medication, made Robert an appointment for the following Tuesday morning, and permitted Mrs. Green to take her son home.
Upon arising at approximately 5:30 o'clock A.M. the following morning (Monday, September 27) Mrs. Green observed that Robert's leg was much more swollen, had turned dark in color, and what appeared to be blisters had formed on the leg, some of which had burst and were emitting fluid. Mrs. Green thereupon decided to take her son to the New Orleans Charity Hospital, rather than back to the Lafayette hospital, giving the reason that previous thereto the Lafayette hospital had always transferred him to New Orleans *709 for any major problem and she felt they simply were not qualified. Mrs. Green left Lafayette with Robert in a friend's automobile about 9 o'clock A.M.
Shortly before arriving in New Orleans the plaintiff testified that Robert's hands, fingernails, and lips turned black, that he complained of being cold and experienced "fits", and that the blisters on his leg had progressed above the kneecap. Robert arrived at New Orleans Charity Hospital at about 11:30 o'clock A.M. in extremely critical condition, and was subsequently examined by a surgeon, Dr. Frank McGregor. During the examination plaintiff sustained a cardiac arrest and had to be resuscitated. In addition to Robert being in "shock" at this time the surgeon noted obvious crepitation (crackling sound) on palpation, 105-6 degree temperature, and immediately diagnosed gas gangrene. Robert's right leg was subsequently removed (about 1 to 1½ hours later) above the knee (about 3 inches below the groin) by means of what is termed a "guillotine" amputation. At the end of the operation Robert sustained a second cardiac arrest and again was resuscitated. Following the operation he spent seven days in intensive care and 71 days in a hospital ward. Approximately one month after the amputation a second operation was performed to close the stump of the leg.
Robert subsequently was admitted to Shriner's Hospital for Crippled Children in Shreveport, Louisiana, on February 8, 1972, where he stayed 51 days. Here he was fitted with an artificial leg and taught to ambulate without crutches. Thereafter he was seen on a periodic outpatient basis for refitting and repair of the artificial limb and also was placed on physical therapy at the Southwest Louisiana rehabilitation Center in Lafayette.
The plaintiff subsequently filed this suit against the State of Louisiana, alleging liability through the Lafayette Charity Hospital and the State Board and/or Department of Hospitals. Plaintiff contended essentially that Doctor Chandradibya, as an employee of the defendant, was negligent in failing to: (a) observe and diagnose the readily detectable gas gangrene by properly interpreting the x-rays; (b) consult with another physician if unsure of his findings; (c) hospitalize Robert so he could be observed. As a result of the above failures it is alleged that Robert's leg had to be amputated and permanent brain damage was sustained. Plaintiff further contended that the doctor's conduct did not conform to the standard of care ordinarily exercised by physicians under similar circumstances.
After a trial on the merits the district judge ruled in favor of the plaintiff, finding negligence amounting to malpractice on the part of Doctor Chandradibya, for which the defendant was responsible. As a result, the judge awarded the plaintiff the sum of $204,292.25, representing (1) $150,000.00 for pain, suffering, disability, and loss of earning capacity; (2) $50,000.00 for future medical expenses and artificial limbs; and (3) $4,292.25 for medical expenses incurred at New Orleans Charity Hospital.
The defendant appealed said judgment assigning as error the following findings: (1) that Doctor Chandradibya was negligent in making his diagnosis and thus guilty of malpractice; (2) that the State of Louisiana was responsible for the alleged acts of negligence on the doctor's part; and (3) that an award of $204,292.75 was justifiable under the circumstances.

NEGLIGENCE OF DOCTOR CHANDRADIBYA
The standard of care by which a physician is judged in malpractice cases is that he "exercise the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill to the case". Meyer v. St. Paul-Mercury Indemnity Co., *710 225 La. 618, 73 So.2d 781 (1954); Uter v. Bone and Joint Clinic, 249 La. 851, 192 So.2d 100 (1966).
The best evidence of the local community standards is found through testimony of other experts in the same field. Helms v. St. Paul Fire and Marine Insurance Co., 289 So.2d 288 (La.App. 3rd Cir. 1974); Lauro v. Travelers Ins. Co., 261 So.2d 261 (La.App. 4th Cir. 1972). Eleven physicians[1], in various fields of medicine, testified in this case either by deposition or at trial.
The medical testimony reveals that gas gangrene is a rare type of life threatening infection caused by gas producing organisms. Although not commonly seen by treating physicians, the record however clearly indicates it is common knowledge in the medical field that gas gangrene is always a possible complication of infection, that the condition has a tendency to move very fast with time being of the essence in treatment, and that it produces bubbles of air trapped in the soft tissues beneath the skin which make crackling sounds (crepitations) upon palpation. Further, the diagnosis thereof is difficult to make, early symptoms of which (besides crepitations) include pain, swelling and discoloration, tenderness, increased body temperature, as well as other conditions present with cellulitis or infection.
Robert Green arrived at the Lafayette Charity Hospital on the night of September 26, 1971, with the abovementioned symptoms (except for crepitations which were not noted). Mrs. Green testified that Doctor Chandradibya indicated the leg appeared infected but that he did not palpate or press anywhere near the affected area. Dr. Jack Gani, a general practitioner, testified that a general standard of care under these circumstances would have been to palpate the infected area to see if crepitations were present. Although there was some evidence to indicate that the gas could be present without crepitation and that crepitation was often absent during the early development of gas gangrene, Dr. W. L. Meuleman (a Lafayette orthopedic surgeon) testified to the effect that in his opinion, considering Robert's condition and symptoms on Sunday night, if the area had been palpated it was probable the treating doctor would have felt crackling sounds. As aforementioned, Dr. Frank McGregor, who performed the amputation, noted obvious crepitation on palpation a little over 12 hours after Robert's initial examination by Doctor Chandradibya.
As aforementioned, an x-ray of Robert's leg was also taken and examined by Doctor Chandradibya, who, according to Mrs. Green noted that no fractures or foreign bodies were present.
Testimony, however, indicates that the following morning Dr. W. S. Maxfield, a hospital radiologist, examined the x-rays taken the night before (as was customary) and noted, insofar as Robert's x-ray was concerned, gas or air in the soft tissues of the leg strongly suggesting the existence of gas producing organisms such as gangrene. He stated although the findings were not what were frequently seen, that the information on the film was sufficient to indicate gas gangrene. He further testified that when he saw no follow-up x-rays he knew there was a strong chance the film had not been correctly interpreted and immediately attempted to determine whether the patient had been admitted to the hospital.
In connection with the incorrect interpretation of the x-ray a number of other physicians testified. Dr. Daniel Voorhies, a Lafayette internist, stated that the air spaces in the x-ray were not hard to see, but that it was "possible" or "conceivable" he would not have seen the bubbles and "probably" would have missed the condition if merely looking at the x-ray for a fracture or foreign body.
*711 Dr. J. O. Holden, a pathologist, testified his first thought at viewing the x-ray would have been to search for a foreign body or fracture. He testified further, however, that the bubbles in the film were not hard to see, but were only difficult to interpret.
An orthopedic surgeon, Dr. Spencer Walton, stated that gas was commonly missed by an average physician in interpreting x-rays but that diagnosis of gas gangrene was not made on the basis of x-rays alone.
Dr. William L. Meuleman testified that the gas was well delineated in the film and if any physician had knowledge of the x-ray, along with Robert's other symptoms, he did not see how any other diagnosis but gas gangrene could have been arrived at. With these symptoms present Doctor Meuleman also testified to the effect that he would not under any conditions have allowed Robert to leave the hospital unobserved. He further indicated that a first or second year doctor would probably have seen the bubbles but not realized or understood the significance thereof.
Two general practitioners also testified in this regard, the first being Dr. Jack Gani. He stated that if he had ordered the x-ray he probably would have been looking initially for a fracture, but that upon further examination thereof would have noticed some pathology, known something was wrong, and consulted a specialist. He further indicated that any doctor looking at the x-ray would have noted an abnormality (even without specifically detecting gas) and called in a consultant. Doctor Gani also stated that he had formerly been an admitting doctor at Lafayette Charity Hospital and read a great deal of x-rays.
Dr. James J. Fournet was the other general practitioner to testify. It is clear from the "Reasons for Judgment" rendered in the trial court that the district judge was impressed with Doctor Fournet's testimony as being "clear and unequivocal. The doctor testified that he was also at one time an admitting physician at Lafayette Charity Hospital, that he felt it was the duty of a physician who ordered x-rays to read them in order to arrive at a diagnosis and if not sure to consult another physician, and that this was the general practice among local physicians. He stated upon examining the x-ray that the pathology (gas and air) was "very obvious", "clear and easily readible", that he had "no difficulty" in seeing its presence, that his "first impression" was the presence of a gas producing organism such as gas gangrene, and that no other diagnosis would have been correct. Further, he indicated he would have immediately called in a general surgeon, kept Robert in the hospital because of the progressive nature of the disease, and that this was the standard of care that should have been taken. Regarding the ability of other general practitioners to read the x-ray and recognize the problem, Doctor Fournet stated:
"... I don't think too many people with a medical degree, you know, looking at this film would fail to see that there's something wrong with it, you know, that there's little shadows that shouldn't be there. I can say that. I think they would look at it and tell you there's something wrong and they probably would come pretty close to telling you what was in it."
He further indicated in reference to whether he would recognize a case of gas gangrene:
"Q. And you would recognize a case though you had never actually seen one before?
A. That's right.
Q. I take it your opinion in this matter is based primarily upon the x-ray?
A. No. My opinion is based on the sequence of clinical events. A child who had a relatively insignificant injury who developed subsequenty *712 swelling, discoloration of an extremity, with increasing amount of pain, elevated temperaturerequiring that the mother bring him into the hospital at a late hour on a Sunday night for emergency treatment, this, in conjunction with a film showing air in the tissue, you know, in the extremity, this is what I base ...."
Finally, the doctor stated he would have been suspicious even without the x-ray because of the temperature, blackiness and tenderness, and that at the very least a severe infection was present.
From the foregoing evidence the trial judge ruled that Doctor Chandradibya did not exercise the particular degree of skill and care required of a physician by the law of the state and as a result was guilty of negligence and malpractice.
Even though the expert witnesses' testimony differed in several respects, it is largely a matter of fact for the trial judge to determine the most credible and realistic evidence and a finding in this regard will not be overturned unless manifest error appears in the record. Christy v. City of Baton Rouge, 282 So.2d 724 (La. App. 1st Cir. 1973), writ refused 284 So.2d 776 (La.1973); State Through Dept. of Highways v. Menefee, 266 So.2d 226 (La. App. 2nd Cir. 1972), writ refused 263 La. 109, 267 So.2d 212 (1972). Under the particular facts and circumstances presented herein we find no manifest error in this conclusion of the district judge.
In this context, however, the defendant contends that it is not malpractice to miss a diagnosis and therefore Doctor Chandradibya was not negligent nor derelict in his professional duty. For this proposition the case of Lauro v. Travelers Ins. Co., 261 So.2d 261 (La.App. 4th Cir. 1972) is cited. The court found in Lauro that under the circumstances present the fact that an erroneous diagnosis resulted did not constitute negligence. We opine, however, that no rule of law was laid down or intended by the Court in Lauro which would automatically preclude a malpractice action on a doctor's failure to correctly diagnose a patient's condition. As heretofore mentioned, it depends upon the particular facts present, comparing the standard or degree of care exercised with that which would have been employed by members of his profession under similar circumstances. For an example where an incorrect diagnosis was held to be negligence, see Fox v. Argonaut Southwest Ins. Co., 288 So.2d 102 (La.App. 4th Cir. 1974).

RESPONSIBILITY OF STATE OF LOUISIANA FOR ALLEGED ACTS OF NEGLIGENCE OF DOCTOR CHANDRADIBYA
In this regard defendant alleges it is not responsible for the actions of Dr. P. Chandradibya because plaintiff failed to establish the existence of a principal-agent (or any other) relationship which would invoke the doctrine of respondeat superior. Specifically, it is argued that the essential element of "close control" over the individual must first be shown and that plaintiff has failed to do this.
This exact defense was raised in Wells v. Woman's Hospital Foundation, 286 So. 2d 439, 443 (La.App. 1st Cir. 1973), writ refused, 288 So.2d 646 (La.1974) wherein the State, through the Department of Hospitals, was sued for damages sustained following treatment by a physician at a charity hospital. Therein the Court considered this argument but found applicable the doctrine of respondeat superior, stating in pertinent part:
"`The Court finds this argument to be without merit. The actual defendant is the State of Louisiana through the Department of Hospitals. The interns employed at Huey P. Long Charity Hospital are physicians serving within the State Department of Hospitals whose function it is by virtue of La.R.S. 40:2001 to administer, manage and operate *713 certain state hospitals. Huey P. Long Charity Hospital is listed under La.R.S. 40:2002 as one of the institutions which has been brought under the administration of the State Department of Hospitals. It is this State agency, therefore, which is the actual employer of the physicians. Any immediate control that the State Department of Hospitals lacks over the physicians has manifestly been delegated to each individual institution. Nevertheless, the State Department of Hospitals, and ultimately the State of Louisiana, remains the principal employer, the essence of the relationship being selection and engagement, payment of wages and power of dismissal.'

. . . . . .
Broadly stated, an employer may be held liable to a third person for any injury which results from the tortious conduct of an employee while acting in the course and scope of his employment. La.C.C. Articles 2317, 2320. (Citations omitted).
It is generally recognized that where a physician is the employee of a hospital sued by a patient for particular injuries negligently inflicted during the course of the patient's treatment, the hospital may be held liable for the injuries sustained by the patient under the doctrine of respondeat superior. (Citations omitted)."
See also Garlington v. Kingsley, 289 So.2d 88 (La.1974), overruling Grant v. Touro Infirmary, 254 La. 204, 223 So.2d 148, cited by the defendant as authority for not applying the doctrine of respondeat superior.
Herein Dr. Daniel W. Voorhies, Lafayette Charity Hospital administrator, testified regarding the employer-employee relationship existing between the State and Doctor Chandradibya. It was essentially his testimony that although not licensed to practice medicine in this state, Doctor Chandradibya was employed as a Civil Service Physician I by the hospital under a temporary institutional permit issued by the Board of Medical Examiners, from July 6, 1970, until January 7, 1972, at which time he resigned before he could be discharged. The discharge was mandatory under a rule of the Board which required a foreign doctor holding a temporary permit to take and pass the state medical examination. Doctor Chandradibya took the exam three times, failing it on each occasion. After the third failure the Board required withdrawal of the permit and advised the doctor to return to medical school for more training. Doctor Voorhies further indicated that during Doctor Chandradibya's employment he worked full time at the hospital with no outside practice, and was paid a salary by the state, from which was withheld income tax and state employer's retirement.
Considering the foregoing jurisprudence, as applied to the facts herein, we feel the doctrine of respondeat superior is clearly applicable and that, as a result, the State of Louisiana through the Department of Hospitals is liable for the negligent acts of its former full-time salaried physician, Dr. P. Chandradibya.[2]

DAMAGES
The defendant finally contends that the district court erred in awarding the plaintiff judgment in the amount of $204,923.75. In support of this position defendant suggests that Robert Green's present condition is no better or worse than if Doctor Chandradibya had properly diagnosed the condition of gas gangrene on the night of September 26th, with treatment of same being *714 instituted at that time. We cannot, however, adhere to this position.
In this regard the trial judge found essentially that Robert's leg deteriorated rapidly following the initial emergency room treatment, that if an operation had been performed Sunday night the boy would have been spared severe suffering and trauma, and finally that because of the mistaken diagnosis Robert was denied an opportunity to have his leg saved or at least a greater portion thereof. The judge also concluded that Robert could never be gainfully employed. We feel the record clearly supports these conclusions.
The medical evidence reflects that if gas gangrene is diagnosed in its early stages, then the recognized proper treatments include massive doses of penicillin, gas gangrene antitoxins, and opening up the area with prompt excision of all the infected tissue (fasciotomy). Although one doctor's testimony indicates most cases involving gas gangrene require amputation, Doctor Meuleman stated that he had performed several fasciotomies on gangrene patients and had successfully saved the infected limbs. This is the procedure he stated he would have taken on the information given him regarding Robert's condition at the time he was examined by Doctor Chandradibya. Two other doctors indicated if the infection is diagnosed early enough that it is possible to save the limb by excision.
All the physicians indicated that amputation is a last resort and is performed only when the infection is so extensive that removal of the involved tissue is inadequate to check the disease, and loss of the limb is inevitable. The quickest and most direct amputation procedure is termed "guillotine", which was the type performed on Robert because of his critical condition. If time permits, however, the surgeon, Dr. Frank McGregor, stated that "flaps" can be constructed to cover the end of the amputated limb, which make the leg more steady at a later time. Testimony further indicated that the lower the stump or cut can be made on a leg the better the individual can use it for walking. Doctor Meuleman estimated disability of a below-the-knee amputee to be almost one-half of that of one above-the-knee and indicated knowledge of a number of cases where such below-the-knee amputees worked as roughnecks and roustabouts with no problems.
In respect to the possibility of saving Robert's leg, if the disease had been diagnosed the night before the amputation, Doctor McGregor testified that it was "remotely possible" to have saved the leg but that it "probably" could not have been done. He did, however, opine that Robert's leg possibly could have been amputated at a lower level, reducing his disability, if the diagnosis had been made 8 to 12 hours earlier. Dr. S. Botero indicated that excision the night before "might" have saved the leg (although not 100% sure). Dr. Spencer Walton admitted that if he had seen gas and the other symptoms present he would have immediately operated to explore the area and excise the dead tissues. He further indicated that the possibility of saving the leg would have certainly increased if the diagnosis had been made 10 or 12 hours earlier.
Doctor Meuleman also testified in this regard and, as is evident from the trial judge's written reasons, the judge was strongly impressed and relied heavily upon said testimony. Doctor Meuleman, in response to questioning stated in pertinent part:
"Q. Assuming that Robert Green's condition between 11 and 12:00 p. m. on the night of September 26, 1971, would've been diagnosed as gas gangrene, and proper treatment would've been immediately instituted, can you say with reasonable *715 medical probability whether or not Robert Green's leg would've been saved?
A. I'd say that in all probability it would've been saved.
. . . . . .
Q. You said there was a probability. Could you give us the percentage of cases where the leg is saved and where the legs have to be amputated or fasciotomies performed?
A. No, I can't, frankly, but just from what I'm seeing, if you notice this gas in this x-ray here, it's all superficial. It's all sitting right on top. I could almost make a book that you could probably just slit that skin and there would probably be very little involvement deep down in the deep fascial plains. I'll almost bet you on that. I'd say it would be probably a cinch to get that kid cleared and closed a week to ten days."
Under the foregoing evidence we have to conclude, as did the trial judge, that it is more probable than not, that had Robert's condition been properly diagnosed by Doctor Chandradibya, his leg would have been saved or at least a greater portion than was. See Mogabgab v. Orleans Parish School Board, 239 So.2d 456 (La.App. 4th Cir. 1970), writ refused 256 La. 1152, 241 So.2d 253 (1970).
The next question raised is whether the amount of the award is justified. Plaintiff seeks an increase of $250,000.00.
Doctor Meuleman estimated Robert's disability of the body as a whole to be 70%. As to his ability to work in the future, the doctor indicated Robert would not be fitted for what most recognize as common labor, and if such was attempted it would have to be in a sheltered situation where Robert was his own boss.
Doctor William P. Cloyd, a psychiatrist also examined Robert on February 19, 1973, and testified that the youth suffered from a mild to moderate degree of mental retardationprimarily since birth, but possibly secondarily associated with the trauma. Mrs. Green had also informed the doctor that she felt Robert had sustained certain emotional and personality changes subsequent to his amputation. The doctor testified that such "could have" resulted from the traumatic event and ensuing shock. In his opinion Robert's amputation coupled with a previous speech defect and retardation present would make the chances slim that he would be able to care for and support himself after beoming an adult. He further opined that due to Robert's overall condition it would be necessary to place the boy in a school for special education and vocational rehabilitation after the age of 16 or 17.
Further testimony regarding Robert's alleged brain damage came from Dr. Frank McGregor and Dr. H. Winston Brown, the latter being a resident neurologist who examined Robert during his hospital confinement. Doctor Brown testified that two electroencephalograms were performed on Robert, October 7 and 14, 1971, which showed abnormal brain activity supportive of insult (injury) to the brain as a result of hypoxia (loss of oxygen) during his two cardiac arrests experienced on September 26th. He could not with any certainty, however, say any permanent brain damage was caused thereby since it appeared that Robert functioned previous to the amputation at an intellectually lower level than normal. Doctor McGregor, on the other hand, indicated it was "possible" that Robert suffered minimal brain damage but that such was unlikely since resuscitation both times took place within a minute, well within the 3 to 4 minute critical zone.
Evidence regarding Robert's estimated lost expected future earnings was elicited from Tom Pierson, an assistant *716 professor of economics and finance. Based upon a working lifetime of 51 years (starting at age 18 until 69) and using a 5% discount rate, he estimated Robert's annual lost earnings as a construction laborer to be $94,538.00; as a manufacturing laborer, $101,965.00; and as an oil and gas laborer, $172,386.00. The trial judge awarded the plaintiff $100,000.00 for loss of future earnings. Considering this testimony we can neither say such an award is excessive or inadequate.
The trial judge also awarded the plaintiff $50,000.00 damages for pain, suffering and disability and $50,000.00 for future medical expenses and artificial limbs. The award of pain, suffering, and disability is clearly within the judge's wide discretion. Anderson v. Welding Testing Laboratory, Inc., 304 So.2d 351 (La.1974), and cases cited therein.
The award for future medical expenses was based upon the testimony of Doctor Meuleman who estimated the following future expenses:

(a) 18 artificial limbs from present age
 to life expectancy of 75 $53,700.00
(b) lengthening of prosthesis and repairs $ 6,770.00
(c) stump socks $ 5,320.00
(d) 4 exterior feet to age 18 $ 350.00
 __________
 Total $66,140.00

Although the trial judge only awarded the sum of $50,000.00 for future medical he did so taking into consideration (as stated in his Reasons for Judgment) the fact that one would have no problem in obtaining substantial interest on a secured investment over the period of time the money would be needed. Under these circumstances we feel such an award was within the great discretion granted the trial judge.
For the above and foregoing reasons the judgment of the trial court is affirmed at defendant-appellant's costs.
Affirmed.
NOTES
[1] Dr. Prapidabi Chandradibya did not testify inasmuch as he returned to Thailand prior to this suit being filed.
[2] By reason of this holding we need not pass upon the question of whether the defendant is independently negligent for its alleged failure to select and furnish (in Doctor Chandradibya) an adequate and competent doctor providing medical services at one of its charity hospitals.