371 So.2d 1221 (1979)
Bobby Ray HARRIS et al., Plaintiffs-Appellants,
v.
STATE of Louisiana, Through HUEY P. LONG HOSPITAL And the State Department of Hospitals, et al., Defendants-Appellees.
No. 6906.
Court of Appeal of Louisiana, Third Circuit.
May 23, 1979.
Writ Granted July 2, 1979.
Riddle, Bennett & Ryland, John T. Bennett, Marksville, Floyd J. Falcon, Jr., of Dodd, Barker, Avant, Wall & Thomas, Baton Rouge, for plaintiffs-appellants.
Provosty, Sadler & deLaunay, LeDoux R. Provosty, Jr., Alexandria, Donald E. Puckett, Baton Rouge, for defendants-appellees.
Before DOMENGEAUX, SWIFT and DOUCET, Judges.
SWIFT, Judge.
This medical malpractice action and another La.App., 371 So.2d 1226, brought by the same plaintiffs against other defendants for the death of their mother were consolidated and are on appeal from judgments after trial on the merits dismissing *1222 the suits at plaintiffs' costs. We affirm. Separate decrees will be rendered in each case.
At approximately 4:30 P.M. on June 19, 1975, Mrs. Lula B. Harris was struck by an automobile and injured. Mrs. Harris was taken first to the emergency room at Marksville General Hospital and shortly thereafter she was transferred by ambulance to Huey P. Long Memorial Hospital (Charity) in Pineville, Louisiana. She was admitted there at approximately 6:00 P.M.
Mrs. Harris was examined initially at Charity by a Dr. McFadden, and after x rays and tests she was assigned to the orthopedic ward for treatment. Besides her injuries and a decreased pulse on the right side, Mrs. Harris had a history of varicose veins and suffered from diabetes.
The patient was then seen by Dr. William L. Seidensticker, an orthopedic resident. He diagnosed her injuries as a central fracture dislocation of the right hip, a dislocation of the right shoulder and a laceration of the left knee. Dr. Seidensticker reduced her shoulder and put a tibial pin in her right leg for traction. He also performed a surgical prep and debridement of her left knee. The doctor testified he felt he had done a very thorough job of cleansing and debriding the wound. Ice packs were ordered for her right shoulder and left knee and Demerol and Vistaril were prescribed for pain. Dr. Seidensticker saw Mrs. Harris again at noon on June 20. There was no significant drainage of the wound. Nor was there any swelling, redness or evidence of infection in the area. Therefore, he did not prescribe antibiotics for the patient. Nor did he order a blood culture. She was seen thereafter at Charity by Dr. Anatolio Wasserman, another orthopedic resident, because Dr. Seidensticker was no longer on duty that weekend. Dr. Wasserman testified that her condition remained stable and he did not find anything unusual from a medical standpoint except a rise in her temperature to 101.8. He said this could have resulted from a number of things and ordered tests, but it was impossible to evaluate the source at that time because of the patient's transfer.
The nurses who attended Mrs. Harris during her stay at Charity testified that the ice packs were applied and the pain medicine administered as per the orders of Dr. Seidensticker. Their reports indicate some complaints of pain in her left leg and the other injured areas, but nothing unusual or of great significance considering her injuries. None of the nurses noted any signs of an infection or discoloration in the patient's left leg. Nor did any of them recall any unusual odor in the room at any time.
On Saturday, June 21, 1975, the plaintiffs became dissatisfied with the care given their mother at Charity. So after getting permission from Dr. T. E. Banks, an Alexandria, Louisiana, orthopedic surgeon, and Rapides General Hospital (Rapides General) in Alexandria, they had her transported by ambulance to that hospital and admitted at approximately 5:00 P.M. This was done against the medical advice of the physician at Charity. Both Dr. Banks and his associate, Dr. Paul M. Davis, Jr., also testified Mrs. Harris would have been better off if she had remained at Charity.
According to the nurses' notes at Rapides General, Mrs. Harris' temperature rose from 100.5° at 8:00 P.M. to 104° at 9:40 P.M. Dr. Banks was in surgery at this time but he was informed. In addition, the notes indicate that the area below the left knee was red and hot to touch and the left leg above the knee was discolored.
During his initial examination of the patient at approximately 10:30 P.M. on June 21, Dr. Banks looked at Charity's x rays, palpated the wound to make sure it was open and draining and put on a clean dressing. In medical terms he considered it to be a dirty jagged type laceration. This did not mean, however, that he saw any dirt or foreign substance therein. He specifically said he did not observe any debris or gravel in the laceration. What the doctor thought was a hematoma was observed on the left thigh where the bandage had been. Dr. Banks testified that Mrs. Harris did not complain of pain in the left leg while he examined it. He had previously ordered a *1223 number of tests. Demerol and Vistaril were prescribed for pain and antibiotics were started. No culture of the wound was taken.
At 5:35 A.M. on Sunday, June 22, Mrs. Harris' temperature again rose to 104° Dr. Banks was notified thereof at 6:05 A.M. and arrived at 6:55 A.M. He was with her only a short time, but being concerned about the "temperature spike" he arranged for Dr. Mervin W. Perdue, an internist, to be called in as a consultant.
Dr. Perdue arrived at Rapides General at approximately 9:00 A.M. and examined Mrs. Harris. He noted that she had a tremendously swollen left leg with hemorrhagic blebs and that her leg was cyanotic and cold. She demonstrated a painful left abdomen on palpation and the physician noted the apparent failure to arterial flow to the left leg. He considered the possibility of a ruptured spleen or other intraabdominal trauma and asked that a surgical consultation be obtained.
Mrs. Harris was also seen by a Dr. Wells that morning, who reported there was no kidney injury.
Dr. Gordon L. Hovnatanian, a surgeon whose practice includes both general and vascular surgery, arrived at Rapides General at approximately 10:30 A.M. Sunday. He testified he saw an elderly woman whose left lower extremity was three to four times larger than her right leg. It was dark, mottled and cold. The laceration over the patella was foul smelling and the edges appeared grossly ischemic and necrotic. There were multiple blisters filled with bloody fluid located on the medial aspect of her upper left thigh. His first impression was hypervolemic shock due to loss of blood and he felt bleeding from the fractured pelvis had increased the size of the thigh.
Dr. Davis, who was on call Sunday for all of Dr. Banks' patients, arrived at Rapides General at about 12:00 noon. When he entered the room he noticed a terrific odor and upon examination the patient was found to be toxic and "completely out in left field".
An arteriogram was performed and it indicated that the main blood vessel to the left thigh was completely blocked. The arteriogram also showed the presence of gas in the tissues. It was at this point that gas gangrene was first suspected by Drs. Hovnatanian and Davis. The patient was immediately taken to the operating room where a fasciotomy was performed. However, she died during surgery.
The concensus of medical opinion was that the cause in fact of the death of Mrs. Harris was gas gangrene myonecrosis. This resulted from clostridium perfringens bacteria that was introduced into Mrs. Harris' body through the laceration over the patella of her left knee.
One or more of the plaintiffs were in their mother's rooms at both hospitals most of the time. Generally, they testified that she complained constantly of pain in her left leg and got them to rub it at frequent intervals. The laceration was dirty and black and the area around the left knee was swollen and discolored. Most of the children said they noticed a very strong and unusual odor from Mrs. Harris (an indication or symptom of gas gangrene) on Friday, June 20, which got worse thereafter. However, her oldest daughter, who said she did not have a keen smell, did not notice any unusual odor until the early morning hours of June 22, at Rapides General.
None of the physicians or nurses who attended Mrs. Harris noticed any strong or unusual odor about her until the morning of June 22, and there is nothing in the hospital records about this prior to that time. All of the medical personnel agreed that the presence of such an odor should and would have been noted therein.
All physicians who were questioned on the subject testified that the gas gangrene is a rare condition that is seldom seen by doctors in the Alexandria or any other area in this country. Although the bacteria, clostridium perfringens, which causes same can be found in most open wounds it will not survive in the presence of oxygen and gas gangrene seldom results. When it does, the infection attacks with suddenness and *1224 violence causing fatalities in most cases. Penicillin in massive doses is the only antibiotic that is considered to be effective. This is not generally given until there is good reason to believe this type of infection is present and most often when such a diagnosis is made it is then too late to save the patient with such medication.
Plaintiffs brought this suit (No. 6906) against the State of Louisiana through the Huey P. Long Memorial Hospital and the State Department of Hospitals alleging that the cause of their mother's death was the negligence of Charity Hospital, its doctors, nurses, agents and/or employees in failing to properly diagnose and treat her condition. Suit No. 6907 was filed by the same parties against St. Paul Fire and Marine Insurance Company and Dr. T. E. Banks alleging that the doctor was negligent in failing to properly diagnose and treat Mrs. Harris.
The only issue before this court is whether the findings of the trial judge adverse to plaintiffs' contentions are manifestly erroneous or clearly wrong in view of the evidence in the record.
The law generally applicable in this type of case was stated by this court in Green v. State, Southwest Louisiana Charity Hosp., 309 So.2d 706, 709, 710, 712 (La.App. 3 Cir. 1975) as follows:
"The standard of care by which a physician is judged in malpractice cases is that he `exercise the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing in the same community or locality, and to use reasonable care and diligence, along with his best judgment, in the application of his skill to the case'. Meyer v. St. Paul-Mercury Indemnity Co., 225 La. 618, 73 So.2d 781 (1954); Uter v. Bone and Joint Clinic, 249 La. 851, 192 So.2d 100 (1966).
"The best evidence of the local community standards is found through testimony of other experts in the same field. Helms v. St. Paul Fire and Marine Insurance Co., 289 So.2d 288 (La.App. 3rd Cir. 1974), Lauro v. Travelers Ins. Co., 261 So.2d 261 (La.App. 4th Cir. 1972)."
* * * * * *
"Even though the expert witnesses' testimony differed in several respects, it is largely a matter of fact for the trial judge to determine the most credible and realistic evidence and a finding in this regard will not be overturned unless manifest error appears in the record. Christy v. City of Baton Rouge, 282 So.2d 724 (La.App. 1st Cir. 1973), writ refused, 284 So.2d 776 (La.1973); State Through Dept. of Highways v. Menefee, 266 So.2d 226 (La.App. 2nd Cir. 1972), writ refused 263 La. 109, 267 So.2d 212 (1972). Under the particular facts and circumstances presented herein we find no manifest error in this conclusion of the district judge."[1]
Nurses and medical technicians who undertake to perform medical services are subject to the same rules relating to the duty of care and liability as are physicians in the performance of professional services. Butler v. Louisiana State Board of Education, 331 So.2d 192 (La.App. 3 Cir. 1976).
The duty owed by a hospital to its patients is to exercise the degree of care, skill and diligence that the particular patient's condition may require and protect the patient from dangers resulting from his incapacities and external circumstances peculiarly within the hospital's control. Bryant v. St. Paul Fire & Marine Ins. Co., 365 So.2d 537 (La.App. 3 Cir. 1979).
In determining the standards of care involved and whether such standards were breached in this case, the trial court was presented the expert testimony of the doctors *1225 who were principally concerned in the treatment of Mrs. Harris. After a detailed review of their testimony and the lay testimony of the plaintiffs, the judge made the following findings in his written reasons for judgment:
"NEGLIGENCE OF DR. SEIDENSTICKER
"Plaintiff at trial sought to establish that Dr. Seidensticker breached the standard of care in the community by his failure to adequately debride the laceration over the patella of Mrs. Harris' left knee, and his failure to diagnose and treat gas gangrene.
"Dr. Seidensticker stated that he performed a surgical prep and debridement of the left knee. Plaintiff presented the testimony of Dr. Banks and Dr. Davis to support their position that the wound was inadequately debrided.
"Dr. Banks stated in his May 7th deposition that he saw no reason to reclean the laceration and that the only thing he saw inadequate concerning the laceration was the bandage which he promptly changed. However, at trial, after having been made a party defendant, Dr. Banks testified that the wound was inadequately debrided at Charity. Dr. Davis, who is a member of the same medical firm as Dr. Banks, stated that he assumed that Dr. Seidensticker adequately debrided the wound. Dr. Davis said that he could not state as a fact that the wound was cleaned adequately. However, in his October 5th deposition Dr. Davis stated as a fact that the wound was inadequately debrided.
"Dr. Wasserman stated that he was of the opinion that after some 48 hours post trauma it would not be possible to go back into a wound and tell at that time whether or not the initial debridement had been performed adequately. Dr. Banks did not examine Mrs. Harris until some 54 hours after the accident. Dr. Davis did not examine Mrs. Harris until some 67 hours after the accident. Dr. Hovnatanian testified that not having seen the wound initially it would be difficult for anybody to pass judgment as to whether or not the laceration was initially debrided adequately or that secondary infection produced the excessive amount of necrotic tissue present in the laceration.
"Mrs. Priscilla Robbins testified that she observed `little gravels' embedded in the wound. Dr. Banks, Dr. Davis and Dr. Hovnatanian examined the laceration after Mrs. Robbins and they made no such finding.
"After an analysis of the testimony of Dr. Seidensticker, Dr. Wasserman, Dr. Banks, Dr. Davis, Dr. Hovnatanian and the lay testimony of the plaintiffs this Court finds that plaintiff has failed to prove by a preponderance of the evidence that the laceration was inadequately debrided and that such inadequacy was a cause in fact of Mrs. Harris' death.
"Plaintiffs' allegation that Dr. Seidensticker breached the standard of care in this community by failing to diagnose and treat gas gangrene is not substantiated by a preponderance of the evidence. The record is completely devoid of any evidence to support a finding by this Court that under the circumstances of this case gas gangrene should have been detected at Charity Hospital. Since there is no basis to find that gas gangrene should have been suspected at Charity, there was no reason for Dr. Seidensticker to order a special anerobic culture sample or give massive dosages of penicillin.
"NEGLIGENCE OF DR. BANKS
"Plaintiff alleges that Dr. Banks breached the standard of care in this community by failing to diagnose and detect gas gangrene. In support of this view plaintiff cites Green v. State, Southwest Louisiana Charity Hospital, La.App., 309 So.2d 706.
"The Third Circuit states in Green that the failure to diagnose can constitute negligence. It depends upon the particular facts present, comparing the standard of care exercised with that which would have been employed by members of his profession under similar circumstances. The facts of this case readily distinguish it from Green.

*1226 "Dr. Banks stated, while admittedly self-serving, that Mrs. Harris did not have any clinical evidence of gas gangrene at the time he saw her Saturday night. Dr. Hovnatanian testified that in his own wildest imagination he did not think he would have suspected gas gangrene. Dr. Davis stated that a review of the physical exam taken by Dr. Banks Saturday night did not indicate or suggest the presence of gas gangrene.
"The evidence adduced at trial does not support a finding that Dr. Banks breached the standard of care in this community by failing to diagnose and detect gas gangrene. There does not exist in the record any evidence supporting the proposition that Dr. Banks should have diagnosed gas gangrene."
When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's findings, on review the appellate court should not disturb this factual finding in the absence of manifest error. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), Canter v. Koehring Company, 283 So.2d 716 (La.1973).
A careful review of the record in this case reveals a reasonable factual basis for the findings of the trial court and that such findings are not manifestly erroneous. We also find that the plaintiffs failed to establish by a preponderance of the evidence any dereliction of duty on the part of the nurses or other employees of Charity.
For the foregoing reasons, the judgment of the district court herein is affirmed at appellants' costs.
AFFIRMED.
NOTES
[1] We are aware that the locality factor is no longer involved in determining the standard of care required of specialists in malpractice cases. Ardoin v. Hartford Acc. & Indem. Co., 360 So.2d 1331 (La.1978). However, in the present case neither side contends that the diagnoses and treatment of gas gangrene is related to any particular speciality or, if so, that the standard of care therefor in any other locality differs from that in Alexandria where all of the experts practiced at the time of this unfortunate occurrence.