413 So.2d 568 (1982)
Coley DAVIDSON
v.
Robert G. PEDEN.
No. 14618.
Court of Appeal of Louisiana, First Circuit.
April 13, 1982.
*569 Dorothy Thomas, Boris F. Navratil, Baton Rouge, for plaintiff-appellant Coley Davidson.
Donald S. Zuber, Baton Rouge, for defendant-appellee Robert G. Peden.
Before LEAR, CARTER and CHIASSON, JJ.
CHIASSON, Judge.
Coley Davidson, plaintiff-appellant, appeals a jury verdict in favor of the defendants-appellees, Dr. Robert G. Peden and his insurer, St. Paul Fire and Marine Insurance Company.
Mr. Davidson brought the present medical malpractice suit against Dr. Peden and his insurer seeking $275,000 in damages. Mr. Davidson alleges that surgery known as an "endo-lymphatic shunt"[1] performed on him by Dr. Peden was not the proper medical treatment for the condition for which the plaintiff was suffering, was not needed and should not have been performed. Additionally, Mr. Davidson alleges that Dr. Peden failed to inform him such surgery may result in total and permanent hearing loss, that he did in fact lose the hearing in his right ear and that, but for the inadequate advice and information furnished by Dr. Peden, he would not have consented to the surgery, but would have chosen other methods of treatment.
Mr. Davidson had been experiencing bouts of vertigo (dizziness) since before 1973. At times, the episodes were so severe, he would fall to the floor with vomiting and nausea. Mr. Davidson testified that up until the time of surgery, his vertigo had become progressively worse during the years and, at the time of the surgical *570 procedure performed by Dr. Peden, he was totally incapacitated in that he had to hire someone to drive him around. On some days Mr. Davidson could not go to work. Without question, the vertigo had adversely affected his job performance as an insurance salesman who had to drive his car.
Dr. E. J. Herpich, an ear, nose and throat specialist in Baton Rouge, testified[2] that Mr. Davidson came to him on December 4, 1973, complaining of fullness in the ears and dizziness for the past two to three years. Dr. Herpich examined Mr. Davidson and found no evidence of apparent disease in the middle ear.
Two days later, Dr. Herpich performed an audiogram[3] on Mr. Davidson to make sure that he did not have any disease and this audiogram was noted as "normal". Mr. Davidson did not see Dr. Herpich again until March 4th and 10th in 1975. At that time, he was complaining of hoarseness and on March 15th, Dr. Herpich performed a direct laryngoscopy in which he removed a benign tumor from Mr. Davidson's right vocal cord. The next two visits to Dr. Herpich involved upper respiratory congestion and coughing. Dr. Herpich next saw Mr. Davidson on July 30, 1975 and on that visit, Mr. Davidson was complaining of itching and soreness in his right ear, which Dr. Herpich diagnosed as otitis externa.[4] On August 26, 1975, Mr. Davidson again complained to Dr. Herpich of severe dizziness. Dr. Herpich performed an audiogram at this time which indicated a fifty decibel loss in the 6000 frequency or a perceptive loss of hearing.[5]
Fullness and discomfort in his right ear precipitated Mr. Davidson's December 23rd, 1975 visit to Dr. Herpich. At this time, Dr. Herpich diagnosed Mr. Davidson's condition as middle ear disease with fluid behind the eardrum. Also, there was an indication of dysfunction with his hearing. The next day Dr. Herpich performed a tympanotomy[6] which was checked on January 9, 1976 as having perfectly healed. On January 23, 1976, Mr. Davidson complained of chest discomfort to Dr. Herpich who told him to go back and see his heart doctor.[7] Mr. Davidson testified that Dr. Herpich thought that his dizziness was probably being caused by a vascular problem. At this visit however, Dr. Herpich conducted another audiogram and noted the perceptive loss of hearing as he had before.
In February of 1976, Mr. Davidson was referred to Dr. Peden for evaluation of vertigo by Dr. Virginia Thurmon, who had been treating Mr. Davidson for his heart problems. Dr. Peden testified that Mr. Davidson complained of vertigo, fullness and pressure in the right ear and stated that he had been experiencing severe vertigo and tinnitus[8] since 1973.
Dr. Peden performed three tests on Mr. Davidson on February 6, 1976. An audiogram was conducted by Dr. Peden's certified audiologist and the audiogram indicated that Mr. Davidson had a traumatic type loss and that there was an eighty-four percent discrimination[9] in the right ear. The left ear was normal. There was a very small five or ten decibel hearing loss in the *571 250 frequency and he returned to normal at the 500 frequency and then started dipping down again as he progressed in the higher frequencies.
The tympanogram[10] indicated decay in the right ear and the electronystagmogram[11] (hereinafter referred to as "ENG") showed that Mr. Davidson's right ear was, for all practical purposes, nonfunctional or suppressed as a result of his disease process. There was a definite lack of function of the electrical system of the right ear.
Dr. Peden testified that he suspected a tumor on the eighth nerve[12] and he thereafter had Mr. Davidson admitted to Our Lady of the Lake Hospital on February 8th for tests to be run by Dr. James A. Poche, Jr., a neurosurgeon.
Dr. Poche was qualified as an expert in this case and he testified that Mr. Davidson was confined with dizziness and questionable X-ray changes. These changes concerned the eighth nerve and Dr. Poche was asked to find out whether the bones had eroded or whether the opening had been enlarged due to a tumor or a mass. Dr. Poche performed a myelogram[13] which indicated that there was no evidence of any tumor. He then concluded that Mr. Davidson was suffering from eighth nerve dysfunction.
Dr. Peden thereafter performed a second ENG on March 26, 1976, and concluded that Mr. Davidson was suffering from a disorder of the inner ear known as "Meniere's Disease or Syndrome". This is the point in the record where the testimony is split.
Dr. Peden testified that after the second ENG, he discussed the possibility of surgery with Mr. Davidson and his wife. Dr. Peden also testified that the possible complications of surgery were fully discussed and there was a detailed discussion concerning finances.
Mr. Davidson testified that Dr. Peden did not discuss any bad results of the endo-lymphatic shunt procedure with him and that he would not have consented to the surgery had he known of the risk of losing his hearing. He stated that he would have gotten another opinion.
Nevertheless, it is agreed that Dr. Peden told Mr. Davidson that he would not operate without consultation on the ENGs he had performed and would get in touch with him. Dr. Peden did call Mr. Davidson a few days later and informed him that surgery would be done. Mr. Davidson was admitted to Our Lady of the Lake Hospital on April 6, 1976; he signed a consent form to be operated on and the endo-lymphatic shunt surgery was performed on the next day. Mr. Davidson lost the hearing in his right ear and thereafter brought the present suit.
The jury found in favor of Dr. Peden and his insurer and Mr. Davidson perfected the instant appeal. On appeal, Mr. Davidson alleges that the jury's determination that Dr. Peden was not negligent in the diagnosis and treatment of his condition was contrary to the law and the evidence and that the trial court erred in failing to instruct the jury on one of the plaintiff's requested charges.
It is certainly clear from the record, and both sides agree, that no one knows the cause, the proper treatment, or the etiology of Meniere's Disease.
Dr. Herpich testified that Meniere's Disease is characterized by tinnitus, dizziness and a loss of hearing. Dr. Miles S. Lewis, *572 an expert in otology who has never performed the "endo-lymphatic shunt" surgery and believes in the medical approach to treatment, stated that there must be a hearing distortion or a fluctuating hearing loss to diagnose Meniere's Disease. On the other hand, Dr. Lewis also recognizes that there are variations of Meniere's Disease, one of which is characterized as not including a fluctuating hearing loss at all. Dr. Thomas A. Graves, an expert in neurotology, stated that you can have any one of the symptoms and be correctly diagnosed as Meniere's Disease.
All of the experts who testified agree with Dr. Peden to the effect that the purpose of "endo-lymphatic shunt" surgery is to eradicate the vertigo and to preserve the hearing. Mr. Davidson testified that since his surgery, the vertigo from which he was suffering has improved, if not cleared up. Dr. Graves testified that, although with the endo-lymphatic shunt procedure, there is at least a chance that the patient will be able to retain his/her hearing, he still prefers the destructive labyrinthotomy procedure which completely eradicates the possibility of hearing.
Dr. Graves testified that the shunt procedure is standard therapy for recurrent vertigo and is the proper medical procedure when the vertigo is intractable, the patient is not responding to medication and the patient is incapacitated.
Dr. Peden (when questioned with regard to the medical approach) testified that he would treat a patient medically if the patient was functional. In this instance, Dr. Peden stated that he was faced with an individual who had incapacitating vertigo, was not responding to medical treatment,[14] was not functional and who pleaded with him to do something to help him.
The conflict existing in the fields of otology and neurotology with regard to Meniere's Disease was extensively argued by experts on both sides and was submitted to the jury for a determination based upon those facts presented.
It is the duty of the jury to weigh and ascertain the credibility of witnesses and to render a verdict. Even though expert testimony differs in several respects, it is largely a matter of fact for the trier of fact to determine the most credible and realistic evidence and a finding in this regard and in regards to whether appellant was informed of the potential risks and dangers of the operation will not be overturned unless it is manifestly erroneous or clearly wrong. Harris v. State, Through Huey P. Long Hospital, 371 So.2d 1221 (La. App. 3rd Cir. 1979); Christy v. City of Baton Rouge, 282 So.2d 724 (La.App. 1st Cir. 1973); Thibodeaux v. State, Etc., 371 So.2d 1227 (La.App. 3rd Cir. 1979); Dupuy v. Tilley, 380 So.2d 634 (La.App. 1st Cir. 1979); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
We conclude that there was sufficient credible evidence before the jury to furnish reasonable factual bases for its findings in favor of Dr. Peden and we, therefore, affirm the jury's findings. Harris, supra; Christy, supra; Arceneaux, supra; and Dupuy, supra.
Counsel for Mr. Davidson urges that the trial court erred in failing to give the following charge to the jury:
"You are instructed that for the consent of the patient to an operation to be binding upon him the patient must be fully informed as to the nature of the ailment, the nature of the operation, and the risks, if any, involved in undergoing the operation.
"You are instructed that any operation on a patient's body is considered by law as a battery unless it is authorized. If a physician operates in any manner on a patient without consent, he is guilty of a battery, and is liable for all injuries resulting therefrom, even though skill was used in the operation. If you find from the evidence that the plaintiff instructed *573 the defendant to perform a certain operation without plaintiff's full and informed permission, then the defendant is guilty of a battery and is liable to plaintiff for all damages resulting therefrom."
Although the requested jury charge was received too late, the record shows that the trial judge considered it before giving the jury its instructions. The court concluded that the said charge was not a full, complete and correct statement of the law insofar as it applies to this case and is not applicable to these particular facts. Additionally, the trial court found that such a charge was too detailed and could be construed as a comment on the evidence. Being so specific could possibly have the effect of directing the jury as to its verdict and such was not the function of the court.
We agree with the trial judge and his instructions as given. It is well-established that although the trial judge is not required to give the precise instructions that are submitted, he is required to give instructions which properly reflect the law applicable in light of the pleadings and facts of the particular case. Beck v. Lovell, 361 So.2d 245 (La.App. 1st Cir. 1978).
Adequate instructions are those instructions which fairly and reasonably point up the issues presented by the pleadings and evidence and which provide correct principles of law for the jury's application thereto. Hanks v. Drs. Ranson, Swan & Burch, Ltd., 359 So.2d 1089 (La.App. 3rd Cir. 1978); Bienvenu v. Angelle, 254 La. 182, 223 So.2d 140 (1969). After carefully reviewing the trial judge's instructions and the requested jury instruction in light of the facts and pleadings of this case, we find the instructions as given by the trial judge to be adequate and, therefore, this assignment of error lacks merit. Hanks, supra; Bienvenu, supra.
The Coppage v. Gamble, 324 So.2d 21 (La.App. 2nd Cir. 1975) case, on which the plaintiff relies, as pointed out by the trial judge, speaks to the consent which is necessary for the performance of operations different in nature from that for which a consent was given. In the case at bar, Mr. Davidson consented to the endo-lymphatic shunt surgery and that is the surgery which was performed. This was also the thrust of the Bryant v. St. Paul Fire and Marine Insurance Co., 272 So.2d 448 (La.App. 2nd Cir. 1973) case in which the court held that the plaintiff-patient's consent to a specific operation included her consent to perform whatever was necessary to remove the potentially cancerous tissue.
Finally, the case of Lombardo v. Argonaut Insurance Co., 354 So.2d 731 (La.App. 4th Cir. 1978) has nothing to do with the instant case. In Lombardo, supra, the question presented was, assuming the defendant-physician did not have informed consent or any consent of the plaintiff for the performance of a surgical procedure, what is the applicable prescriptive period to such a cause of action, i.e., one year or ten years? As the trial judge in our case pointed out, Lombardo dealt with prescription and has nothing to do with the issue presented by this particular case.
For these reasons, the judgment of the trial court is affirmed at appellant's costs.
AFFIRMED.
NOTES
[1] Endo-lymphatic shunt surgery is a procedure in which the physician microscopically inserts a very small plastic tube into the endolymphatic sac located in the internal auditory canal or mastoid cavity.
[2] Dr. E. J. Herpich's testimony was introduced by reading his deposition into the record since, due to illness, he was unable to testify.
[3] A method of testing an individual's hearing is a test known as an audiogram. This is a process whereby various frequencies of sound at various levels of intensity are introduced to the patient via earphones.
[4] Otitis externa is an inflammation of the ear canal.
[5] Perceptive loss of hearing deals with the ability of the nerve to carry that sound from the inner ear to the brain. It is also known as nerve deafness.
[6] Tympanotomy is a procedure in which the eardrum is deadened and opened in order for the fluid behind the eardrum to be released.
[7] Mr. Davidson has a history of heart problems which includes a coronary bypass.
[8] Tinnitus is a ringing in the ears.
[9] One hundred words are introduced to the patient who is to repeat the words back. Mr. Davidson was able to repeat 100% of the words introduced into his left ear and was only able to repeat 84% of the words introduced into the right ear.
[10] Tympanogram is a test done to measure the eardrum compliance or movement and the bones involved in the hearing process.
[11] An electronystagmogram is a test whereby a balloon is placed in the patient's ear and various temperatures of water are circulated therein. The purpose of the ENG is to measure the electrical output of the ear by electrically measuring eye movement caused by the circulating water and recorded by electrodes which are taped around the patient's eyes.
[12] The eighth nerve is the nerve which controls hearing.
[13] The myelogram performed on Mr. Davidson was a procedure in which a dye was introduced and maneuvered into the area of the eighth nerve and X-rays were taken to determine if a tumor existed.
[14] Mr. Davidson has a history of being on numerous medications for a number of years. In fact, on Mr. Davidson's history, Dr. Peden noted that medical therapy had not proven successful.